*Richmond.*

## Norfolk and Western Railway Company v. Nottingham and Wrenn, Inc.

September 25, 1924.

1. Trover and Conversion—*Conversion by Carrier—Measure of Damages.*—While the usual rule in cases of conversion of goods is that the measure of the recovery is their value at the time and place of conversion, the general rule, when property is delivered to a carrier for transportation and is by the carrier converted, is that the measure of the recovery is the *fair market value* of the property at its destination, less the cost of transportation and expenses of sale there.

2. Carriers—*Interstate Commerce Act—Tariffs, Rules and Regulations—Contract of Affreightment.*—In order to prevent rebates and discrimination, the act to regulate commerce (U. S. Comp. St. §8563 et seq.), and the tariffs, rules and regulations promulgated in pursuance thereof, constitute the contract of affreightment between the carrier and shipper, which can neither be altered or amended by agreement or conduct of the parties.

3. Carriers—*Conversion of Coal by Carrier—Measure of Damages—Cummins Amendment—Case at Bar.*—In the instant case, an action by a shipper against a carrier for conversion of the coal shipped, the carrier claimed that under the interstate commerce act and the tariffs, rules and regulations promulgated in pursuance thereof, the measure of damages should be "computed on the basis of the value of the property at the time and place of shipment." But at the time the coal in question was taken, this method of computing damages was inconsistent with, and invalidated by, the provision of the Cummins amendment of March 4, 1915, to the Carmack amendment (U. S. Comp. St. section 8604a) that carriers shall be liable to the holder of the bill of lading for the full actual loss, damage or injury, notwithstanding any limitation of liability, or limitation of amount of recovery, or representation or agreement as to value. And where, as in the instant case, coal shipped to tidewater piers for sale in the spot market there was confiscated by the carrier, the measure of recovery would be the fair market value of the property at its destination.

4. CARRIERS—*Conversion of Coal by Carrier—Cummins Amendment—Nonadjacent Foreign Country—Case at Bar.*—The Cummins amendment to the Carmack amendment (U. S. Comp. St., section 8604a), providing that carriers shall be liable for the full actual loss to the holder of the bill of lading, notwithstanding any limitation of amount of recovery, is confined to transportation which is wholly interstate, "or from any point in the United States to * · * * an adjacent foreign country," and does not apply to transportation to a foreign country not adjacent. In the instant case the confiscated coal was put moving in transportation from the mines tagged for a pool at the tidewater piers; no bill of lading was issued; the railroad officials knew that the plaintiff sold coal at the piers for shipment to Europe to buyers who paid the highest spot prices. Coal from the pools was shipped to foreign countries adjacent and nonadjacent, and coastwise to New England.

*Held:* That the confiscated coal in the instant case had never had any impress of nonadjacent foreign commerce upon it, and the Cummins amendment invalidated a regulation of the tariff that damages for conversion must be computed on the basis of the value of the property at the time and place of shipment.

5. CARRIERS—*Conversion of Coal by Carrier—Cummins Amendment—Nonadjacent Foreign Country.*—Upon the question of whether a transportation is wholly interstate or to an adjacent foreign country so as to bring it within the Cummins amendment, it is the fact of the destination at the time of shipment which determined the character of the commerce, and not contingent intent or probabilities of the destination.

6. CARRIERS—*Conversion by Carrier—Confiscation of Coal—Act to Regulate Commerce.*—The act to regulate commerce and the tariffs, rules and regulations promulgated in pursuance thereof have no application to an action by a shipper against a carrier who has confiscated a shipment of coal for its own use.

7. CARRIERS—*Conversion by Carrier—Confiscation of Coal—Act to Regulate Commerce.*—The act to regulate commerce relates to transportation and its incidents, and fixes the correlative rights and duties between the shipper and carrier growing out of their contract, but there is no right to compel the shipper to furnish the carrier with the fuel and instrumentalities necessary to perform that service nor any of its public duties.

8. CARRIERS—*Conversion—Limitations of Value.*—Limitations of value in an ordinary bill of lading have no relation to loss due to conversion of the property by the carrier.

9. CARRIERS—*Conversion by Carrier—Confiscation of Coal—Fifth Amendment—Just Compensation—Determination of Compensation a Judicial Question*—The confiscation by a carrier of a shipment of coal is a

taking of private property for public use, and that may not be done, either by the government or any of its agencies, under the fifth amendment, without just compensation. When the United States or a common carrier take fuel for its purposes, it is bound to award just compensation, and what is just compensation under the Constitution is determined by the same legal principles in war as in peace. The ascertainment of compensation is a judicial function, and no power exists in any other department of the government to declare what the compensation shall be, or to prescribe any binding rule in that regard.

10. CARRIERS—*Conversion—Confiscation of Coal—Embargo—Allocation of Cars Confiscated—Case at Bar.*—In the instant case, an action for confiscation of coal destined for tidewater, the Interstate Commerce Commission had ordered an embargo placed on shipments of coal east, until a certain percentage of cars allotted to each operation was consigned to the lakes. After this suit was brought the carrier undertook to allocate to the lake certain cars that it had confiscated, and which it had accepted in transportation tagged for the tidewater piers, thus reducing its liability in the nature of an offset.

*Held:* That this it could not do.

11. CARRIERS—*Conversion by Carrier—Confiscation of Coal—Market Value—Evidence.*—In the instant case, an action for the confiscation of coal by a carrier destined for tidewater piers, the subject of proof before the jury was the spot market value at tidewater of the coal confiscated, where there was an active market, easily capable of proof by the market quotations and actual sales made.

*Held:* That evidence tending to prove prices at which coal was sold in different parts of the country, and a report to the Senate Committee showing what other parties paid for fuel, was properly rejected.

12. WITNESSES—*Memoranda—Refreshing Memory.*—A witness may refresh his memory from memoranda, if, after being refreshed, he speaks from a present and existing recollection, and not from the source of refreshment.

13. WITNESSES—*Memoranda—Refreshing Memory—Case at Bar.*—In the instant case the question at issue was the market price of coal at tidewater. Witnesses who used means of refreshing their memory were engaged in selling coal on the spot market at tidewater and knew the market prices generally, but, when called upon to state accurately the price at which coal was sold at or near the date in question, resorted to their memoranda, whereupon counsel objected to the testimony, unless the witnesses looked at the papers from which they refreshed their memory, then folded them up and called out the figures from recollection. This the court refused to compel the witnesses to do.

*Held:* No error, as the proper inquiry in cases of this nature is whether the witness has any independent recollection at all, and not how much a person may remember certain amounts or prices, approximately, at which he sold or saw sold certain articles, and not be able to reproduce the exact figures, but when shown the figures recognizes them as correct.

14. Carriers—*Conversion by Carrier—Prices at which Coal Billed Railway—Estoppel.*—In the instant case, an action against a carrier for confiscation of a shipment of coal, the Supreme Court of Appeals was asked to apply the doctrine of estoppel to the plaintiff's prices at which he billed his coal to the railway prior to this suit as the market prices at tidewater, on the principle that it could not claim in excess of the amounts therein stated. These figures went before the jury, whose province it was to say whether the prices contained in the bills were true, or those testified to on the trial, and the court cannot disturb their verdict.

15. Appeal and Error—*Conflicting Evidence.*—Where a patient and painstaking investigation of each point and objection revealed no errors of law in the rulings of the lower court, and the evidence, while conflicting, sustained the verdict, the judgment of the lower court upon the verdict must be affirmed.

Error to a judgment of the Circuit Court of the city of Norfolk, in a proceeding by motion for a judgment for damages. Judgment for plaintiff. Defendant assigns error.

*Affirmed.*

The opinion states the case.

*F. M. Rivinus, R. M. Hughes, Jr.,* and *Waller R. Staples,* for the plaintiff in error.

*Thomas W. Shelton* and *Alfred Anderson,* for the defendant in error.

Christian, J., delivered the opinion of the court.

During the year 1920, especially from May to De-

cember of that year, the market for coal was in a very chaotic and inflated condition on account of strikes at the coal operations, transportation troubles, and the very active demand for foreign shipment. In consequence thereof prices for coal were abnormally high, so high in fact that the executive department of the United States was invoking the Lever act (U. S. Comp. St. 1918, U. S. Comp. St. Ann. Supp. 1919, § 3115⅛-e, *et seq.*), and exerting the power of the Interstate Commerce Commission to restrain profiteering in coal. The tidewater market in Hampton Roads where coal was delivered into pools at the piers by the coal carrying railroads to be dumped into seagoing vessels for shipment abroad, and coastwise to New England and other points beyond the capes, and where the sales were made daily upon what is shown as a "spot market," was especially active and the prices for coal much higher than elsewhere. The profits from the tidewater market were so much greater than the other markets, that the Interstate Commerce Commission found it necessary to place an embargo from July 20th to October 26, 1920, upon shipments to tidewater until a certain percentage of the cars of coal loaded at each mine was shipped to the lakes for transportation to the Northwest Territory, for protection of the inhabitants thereof who stored their coal in the summer and early fall for winter use from shipments over the lakes before lake transportation was closed. It established pools at the lakes, according to grade and quality of coal, similar to those at tidewater, except that its appointee fixed the prices of coal in the pool, and the shipper got credit in the pool when his coal passed Portsmouth, Ohio, as stated in testimony of Ferebee.

· In the coal situation above outlined the Norfolk and Western Railway Company, one of the largest coal carrying roads in this country, had a strike with the miners at its own mines and the mines of the operators with whom it contracted for its necessary fuel to operate its trains. About May 1st the situation became so acute that in order to perform its duty as public carrier, it determined *to confiscate* so much of the coal placed into transportation from other mines on its line not affected by strikes as would be necessary to operate its trains. In order to work as little hardship as possible and not discriminate against any shipper, it confiscated a *pro rata* number of cars of coal from each · shipper according to car rating of the mines, and notified each shipper of the number of the cars, weight of coal and date of confiscation, with request that said coal so confiscated be billed to it at reasonable prices, which bills were paid.

A very large majority of shippers billed their confiscated coal as requested at prices satisfactory to the railway, but Nottingham and Wrenn, Inc., hereinafter called the plaintiff, some of whose coal was confiscated, billed its coal at or near the prices obtaining at tidewater. This account of the plaintiff was rejected because the railway deemed its prices illegal, but after some correspondence the railway paid the plaintiff for said confiscated coal at $6.00 per ton, or a total of $37,176.30, which was accepted under the mutual agreement that said payment was made and accepted without prejudice to the plaintiff's right to sue for the balance it claimed was due to it. The quantity of coal, weight and date of its confiscation was admitted in an agreement of facts between the parties so that

the only matter in controversy was the difference between the amount paid and the amount claimed as the proper price by the plaintiff for said coal.

Suit was brought in the Circuit Court of the city of Norfolk by the plaintiff against the railway for $46,-315.78, the difference between the amount paid as aforesaid and the spot market price of said confiscated coal at the tidewater piers at the time when the coal should have reached the pool. Upon issue joined and evidence the jury found in favor of the plaintiff for the full amount claimed, the court refused to set aside the verdict and entered up judgment upon said verdict. Thereupon the railway applied for this writ of error which was granted.

Various exceptions were taken to the rulings of the court upon the rejection of its special plea, the admission and rejection of evidence, the giving and refusing certain instructions, and the refusal of the court to set aside the verdict of the jury which will be discussed in their logical order.

Before issue was joined in the case the difference between the plaintiff and defendant railway as to the law which should govern the trial was presented to the court for decision by the railway's special plea No. 1, wherein it alleged that the rule to govern was the "fair value of the coal at the place and time of shipment." The plaintiff moved the court to reject this plea because the measure of recovery is the fair market value of the property at its destination. The court sustained the plaintiff's motion, rejected the special plea, to which ruling of the court the railway excepted, and this ruling of the court is the first and most cardinal error urged for the reversal of this judgment, as the rule approved

was the law of the trial and governed the admission and rejection of testimony, and instructions given and refused.

1] The above rule of law thus adopted, and the rejection of the special plea, was right and in accord with the general rule governing such cases, as stated by Judge Prentis in the opinion of the Supreme Court of Appeals of Virginia in the case of *Eastern Coal and Export Corp.* v. *N. & W. Ry. Co.*, 133 Va. p. 529, 113 S. E. p. 858, as follows:

"While the usual rule in cases of conversion of goods is that the measure of the recovery is their value at the time and place of conversion, the general rule when property is delivered to a carrier for transportation and is by the carrier converted, the measure of the recovery is the *fair market value* of the property at its destination, less the cost of transportation and expenses of sale there. *C. & O. R. Co.* v. *Stock*, 104 Va. p. 104, 51 S. E. 161."

The principle of the rule is briefly stated by the United States Supreme Court in the *United States* v. *New River Collieries Company* (decided May 21, 1923), 262 U. S. 341, 43 Sup. Ct. 565, 67 L. Ed. 1014, as follows: "The owner was entitled to what it lost *by the taking.* To the same effect is the language of Knapp, circuit judge, in *Norfolk & Western Railway Co.* v. *Ft. Dearborn Coal & Export Co.* (C. C. A.), 280 Fed. 266: "Plaintiff is, of course, entitled to be made whole, not as against an improvident purchase or a falling market, but for the actual loss it suffered by the defendant's appropriation of its coal." The above seems to be the general rule of law without exception and further citation of authority would serve no good purpose.

[2, 3] The railway further presented this contention by instructions offered on its part and refused, as well as objections to instructions given for the shipper, that the recovery in the case must be "*computed on the basis of the value of the property at the time and place of shipment,*" which provision is contained in the tariffs under which the coal was moving and that said tariffs were approved by the Interstate Commerce Commission and had the force and effect of a statute. In order to prevent rebates and discrimination the act to regulate commerce (U. S. Comp. St. §8563, *et seq.*), and the tariffs, rules and regulations promulgated in pursuance thereof, constitute the contract of affreightment between the carrier and shipper which can neither be altered nor amended by agreement or conduct of the parties, has been so imbedded in the law of interstate commerce as never to be questioned. At the time this coal was taken this method of computing damages aforesaid was inconsistent with, and invalidated by, the provision of the Cummins amendment of March 4, 1915, to the Carmack amendment (U. S. Comp. St. section 8604-a), that carriers shall be liable to the holder of the bill of lading for the full actual loss, damage or injury, notwithstanding any limitation of liability, or limitation of amount of recovery or representation or agreement as to value. *Chicago, Milwaukee & St. Paul Railway Co.* v. *McCaull-Dinsmore Company*, 253 U. S. 97, 40 Sup. Ct. 504, 64 L. Ed. 901.

[4, 5] Counsel for the railway company had knowledge of the Cummins amendment, but contended it is confined to transportation which is wholly interstate "or from any point in the United States to * * * * an adjacent foreign country," while the transportation here in question was to a foreign country not adjacent. *Dexter & Carpenter, Inc.* v. *Davis, Agent,*

*etc.* (C. C. A.), 281 Fed. 388, 25 A. L. R. 1173. The coal confiscated for fuel in the above case by the Director General of Railways *was admitted to be moving under contract to purchasers in Europe.* Thereupon, if the Cummins amendment is confined to wholly interstate commerce, or transportation from any point in the United States to an adjacent foreign country, then the amendment does not apply to the case under investigation if the shipment was to nonadjacent foreign country, and the statutory rule of the tariffs constitutes the exclusive measure or standard by which plaintiff's damage could be ascertained.

Conceding that the above is the correct statement of the law, the facts of the case must determine whether the coal was a shipment to tidewater or to a European country. The confiscated coal was put and moving in transportation from the mines tagged for the pool at the tidewater piers; it had passed the Bluefield scales eastbound; no bill of lading was issued, the railroad officials knew that the plaintiff sold coal at the piers for shipment to Europe, to buyers who paid the highest spot prices for coal for shipment thence, and in fact were told that the plaintiff wanted the coal for sale in the spot market. It is an undisputed fact that coal from the pools was shipped to foreign countries adjacent and nonadjacent, and coastwise beyond the capes to New England, depending on previous contracts or to whom sold in the tidewater market. In *Texas & N. O. R. Co.* v. *Sabine Tram. Co.*, 227 U. S. 111, 33 Sup. Ct. 229, 57 L. Ed. 443. The lumber was sold to Powell for shipment to Europe, was cut in such manner as demanded by the export trade and while shipper consigned it to Powell at Sabine, Texas, as per his agreement, Powell was to unload it from cars, load the timber on lighters; place it in reach of the ship's crane; the bill

of lading was marked "for export" which gave the lumber certain switching privileges, as well as thirty days free of demurrage. At the time this lumber was shipped it was destined by Powell for export to some foreign port. *Sabine Co.* contended that its contract was intrastate being between two points in Texas, but the Supreme Court held that the lumber was shipped in compliance with contract for sale for export and the fact of unloading and reloading did not prevent it from becoming interstate commerce from point of shipment, which was only the first step toward its destination.

It was the fact of the destination at the time of shipment which determined the character of the commerce, and not contingent intent or probabilities of the destination. In *Gulf C. & S. F. R. Co.* v. *Texas*, 204 U. S. 403, 27 Sup. Ct. 360, 51 L. Ed. 540, "the Hardin Grain Company, doing business in Kansas City, Missouri, having made a contract with parties at Goldthwaite, Texas, for the delivery of two carloads of corn at that place, in order to comply with their undertaking, contracted to purchase of the Harroun Commission Company, who were also doing business at Kansas City, Missouri, and had an agent at Texarkana, Texas, the same quantity of corn to be delivered at the latter point. The corn with which the Harroun Commission, Company proposed to fulfil their contract was shipped from South Dakota to Texarkana, Texas, through Kansas City, Missouri. It was delivered at Texarkana, Texas, in accordance with the agreement, to the Hardin Grain Company, who thereupon shipped it in the same cars, without breaking bulk, over the Texas and Pacific Railway and its connecting lines to Goldthwaite, Texas." It was held that the second shipment to Goldthwaite from Texarkana was intrastate, for the

contract for delivery of the corn at Texarkana had been completed. "It was then and not till then did the Hardin Company have full title to and control of the corn, and that was after the first contract of transportation had been completed."

It is clear from the uniform line of the authority of the Supreme Court that the confiscated coal in the case under consideration had never had any impress of nonadjacent foreign commerce upon it, and the Cummins amendment has invalidated the regulation of the tariff aforesaid and the court was right in rejecting it as applicable in any way to facts of this case.

[6-9] Certain officials of the railway have acted in this transaction with the utmost fairness, and conscientious belief of their authority, but under a mistaken view of the effect and scope of the act to regulate commerce, and that act nor the tariffs, rules and regulations, promulgated in pursuance thereof, have any application to this controversy. The act aforesaid relates to transportation and its incidents, and fixes the correlative rights and duties between the shipper and carrier growing out of their contract, but there is no right to compel the shipper to furnish the carrier with the fuel and instrumentalities necessary to peform that service nor any of its public duties. Fuel is a matter of purchase, and if carrier takes same without bargain and sale, it is a trespasser which no necessity can excuse but may mitigate the aggravation of the act, but cannot deprive the owner of just compensation. Limitations of value in an ordinary bill of lading have no relation to loss due to conversion of the property by the carrier. The confiscation of the plaintiff's coal was a taking of private property for public use, and that may not be done, either by the government or any of its agencies, under the fifth amendment "without just

compensation." When the United States or a common carrier take fuel for its purposes, it is bound to award just compensation, and "what is just compensation under the Constitution is determined by the same legal principles in war as in peace." The ascertainment of compensation is a judicial function and no power exists in any other department of the government to declare what the compensation shall be, or to prescribe any binding rule in that regard." *United States* v. *New River Collieries*, 262 U. S. 341, 43 Sup. Ct. 565, 67 L. Ed. 1014; *Dexter & Carpenter, Inc.* v. *Davis* (C. C. A.), 281 Fed. 385.

The ruling of the Supreme Court of the United States in *G. F. & A. R. Co.* v. *Blish Milling Co.*, 241 U. S. 190, 36 Sup. Ct. 541, 60 L. Ed. 948, is not contrary to above decisions. In that case the company had a claim against the railroad for misdelivery or failure to deliver flour. In order to avoid the four months provision for notice, the company brought an action of trover against the railroad. The court held the provisions of the bill of lading had the force and effect of a statute and governed the trial, and could not be varied by the parties by the form of action or otherwise.

It is safe to assert that neither the act to regulate commerce nor the Lever act (which has since been held void, *United States* v. *L. Cohen Grocery Co.*, 255 U. S. 81, 41 Sup Ct. 298, 65 L. Ed. 516, 14 A. L. R. 1045), can or has fixed the amount of the plaintiff's just compensation, or the means by which it was to be computed. *United States* v. *New River Collieries Co., supra; Dexter & Carpenter, Inc.* v. *Davis* (C. C. A.), *supra.*

[10] The interstate Commerce Commission ordered an embargo placed on shipments of coal east until a certain percentage of the cars allotted to each operation was consigned to the lakes. This embargo was not

strictly enforced daily by the railway, but credit seems to have been extended shippers which they were permitted to make up subsequently. The extent of this practice does not appear fully, but after this suit was brought the railway undertook to allocate to the lakes certain cars that it had confiscated and which it had accepted in transportation, tagged for the tidewater piers, thus reducing its liability in the nature of an offset. This it could not do. It had no pecuniary interest in the embargo and a proper performance of its duty by virtue of the embargo was to refuse to accept the cars at the mines, or if they had been moved by mistake, stop them until properly rerouted. The law fixed the just compensation of the plaintiff for its coal confiscated at the market value at destination at the time of arrival, but for the taking, and will not hear the railway plead its own carelessness or indulgence, to change destination even if the railway had power to reroute the cars under terms of the embargo after they had passed the Bluefield scales. Its authority was to refuse to furnish cars, and if improperly loaded and tagged, refuse to haul them from the mines. The law of the case was correctly ruled by the learned judge at the trial and the jury properly instructed, hence it must follow that the railway objections are overruled without detail specification of them.

[11] The next error assigned is the rejection of the deposition of Morrow and the report of the Interstate Commerce Commission to the Senate Committee. The Morrow deposition tended to prove the prices at which coal was sold by a large number of operators in the different markets of the country, while the report to the Senate Committee showed what the southeastern railways paid for fuel. The subject of proof before the

jury in this case was the spot market value at tidewater of the coal confiscated. *This market was determined by supply and demand.* There was a very active market there, with trading in coal in large quantities on the spot market every day; this market was easily capable of proof by the market quotations and actual sales made, and the evidence of the prices received and paid for coal by others in other markets, or even prices paid others for coal similarly confiscated, was irrelevant to the inquiry and could serve only as a comparison of the value of the coal with the market price at tidewater, thus proving that the plaintiff was profiteering and therefore not entitled to recover above the six dollars per ton. This is not the law, therefore the evidence was properly excluded.

The case of *N. & W. Ry. Co.* v. *Ft. Dearborn Coal Co., supra,* was tried upon the theory of law that the measure by which to compute the damages for the confiscated coal was the price at which the coal company bought it at the mines, and a very different rule of admissibility of testimony would apply. The issue was the value of the coal proven by purchase price, not the market price at tidewater, therefore the case was reversed.

The *Eastern Coal and Export Corp.* v. *N. & W. Ry. Co., supra,* the plaintiff sought to recover the contract price at which the coal was sold for shipment to Sweden, as just compensation. To meet the rule that fair market value at tidewater was the proper standard of computation, it undertook to prove that the market at tidewater and the contract prices were the same. In this case also it is manifest that different rules of admissibility of testimony would be applicable and the language of the learned judges who delivered the aforesaid opinions, respectively, are not germane to the action

of the court in rejecting the evidence of Morrow and the report to the Senate Committee in this case.

[12-13] Counsel excepted to the court's action in allowing Houston and others to refresh their memory from memoranda from their books by others, or themselves. That a witness may refresh his memory from memoranda is admitted. In *Mankin* v. *Aldridge*, 127 Va. 768, 105 S. E. 462, the court said "no matter by what kind of paper the recollection of a witness is refreshed, if, after being refreshed, he speaks from a present and existing recollection and not from the source of refreshment, his testimony is admissible." 1 Greenl. on Ev. (16th ed.), section 429-c; *Harrison* v. *Middleton*, 11 Gratt. (52 Va.) 527; *Portsmouth St. R. Co.* v. *Peed*, 102 Va. 676, 47 S. E. 850.

Each of the witnesses who used means of refreshing their memory was engaged in buying and selling coal on the spot market at tidewater and knew the market prices generally, but when called upon to state accurately the price at which coal was sold at or near the date when the confiscated coal should have arrived at the piers resorted to their memoranda, whereupon counsel for the railway objected to the witness testifying unless he looked at the paper, then folded it up and called out the figures from recollection. This the court refused to compel the witness to do and no further test of his recollection was made. The proper inquiry in cases of this nature is whether the witness has any independent recollection at all, and not how much a person may remember certain amounts or prices approximately at which he sold or saw sold certain articles and not be able to reproduce the exact figures, but when shown the figures recognizes them as correct, this would not be hearsay, therefore excluded. Greenleaf on Evidence (15th ed.), section 436. No further test was

made of Houston's recollection, he said he had examined the very figures on the paper from his books that morning and previously testified that he was acquainted with spot coal market at tidewater.    It does seem that he was not without independent recollection, and the court properly admitted his evidence, the weight of which was for the jury.    The same ruling will have to be made to the other witnesses, Houston being typical of all of them, as to do otherwise would extend this opinion unreasonably.

[14] This court is asked to apply the doctrine of estoppel to the plaintiff's prices at which he billed his coal to the railway prior to this suit as the market prices at tidewater, on the principle that it could not claim in excess of the amounts therein stated.    These figures went before the jury, whose province it was to say whether the prices contained in the bills were true or those testified to on the trial, and the court cannot disturb their verdict.

[15] After the verdict the railway made a motion to set aside the verdict and grant it a new trial which motion was overruled.    The case was very closely contested, and every point which learned and skillful counsel could raise presented, but a patient and painstaking investigation of each point and objection made, commensurate with the importance of the case, reveals no errors of law in the rulings of the circuit court and the evidence, while conflicting, sustains the verdict of the jury, therefore, under the law, the judgment will have to be affirmed.

*Affirmed.*