WARD v. GULF, M. & N. R. CO. et al.—134 S. W. (2d) 917.

Western Section. August 3, 1938.

Petition for Certiorari Granted by Supreme Court, March 4, 1939.

Affirmed by Supreme Court, July 1, 1939.

J. C. Rutschman, of Memphis, for plaintiff in error.

Evans, Evans & Creson, Canada & Russell, Cooper Turner, Jr., and Emmett W. Braden, all of Memphis, for defendants in error.

ANDERSON, J. This was an action at law against three common carriers to recover damages sustained by reason of the alleged breach of a contract for the interstate trasportation of personal property by rail. The contract is known as a "Special Baggage Car Contract." The shipment, consisting of show and carnival equipment, originated at Covington, Tennessee, and was destined to Philadelphia, Mississippi, where it arrived after considerable delay and in a damaged condition.

The defendants, among other things, plead specially that the contract under which the property was shipped had a provision placing an agreed valuation thereon and fixing the basis of the carriers'

liability in the event of partial loss or damage; and that plaintiff's recovery, if any, should be limited accordingly.

As against this defense, plaintiff contended that there had been a substantial deviation in the mode of transportation agreed upon in the written contract and hence the defendants were to be regarded as having abandoned the contract provision set up in the special plea.

At the close of plaintiff's evidence, the defendants, Gulf, Mobile & Northern Railroad Company and the trustee of the St. Louis-San Francisco Railway Company, moved that a verdict be directed for plaintiff and his damages assessed at $250, the maximum amount that he could recover under the contract provision plead by the defendants as applied to the undisputed facts. This motion was granted and judgment was entered accordingly.

At the same time, a verdict was directed in favor of defendant, Illinois Central Railroad Company, the initial carrier, and the suit dismissed as to it, presumably on the theory it was not responsible for any deviation or damage. For reasons hereinafter stated, we are not concerned with the result as to that defendant.

The plaintiff brought the case here by an appeal in error.

It is conceded that the sum of $250 fixed in the directed verdict is the amount recoverable if the contract limitation relied on was applicable and controlling. The questions for decision arise on the plaintiff's contention that the provision was abandoned or waived by a substantial deviation in the contract of shipment resulting from the manner in which the transportation was effectuated.

The property, as stated, consisted of show and carnival equipment and was transported from the point of origin on the line of the Illinois Central Railroad Company to destination by way of the Illinois Central to Memphis Tennessee, St. Louis & San Francisco Railway Company to New Albany, Mississippi, and thence by the Gulf, Mobile & Northern Railroad Company to destination. This was the routing agreed upon.

The original contract was in writing and, as stated was known as a "Special Baggage Car Contract." Under its terms the carriers agreed to furnish "special baggage car service," consisting of one car to be moved between the point of origin and the point of destination by the route above mentioned. Pursuant to this agreement, the Illinois Central Railroad Company furnished a steel baggage car into which the property was loaded at Covington, Tenn. After being loaded this car was picked up by a passenger train at or about 5 o'clock on Sunday afternoon and transported by that company over its lines to Memphis, Tennessee. The shipment arrived at destination over the Gulf, Mobile & Northern Railroad on the following Wednesday, loaded in two freight cars which, among others, made up a freight train, and in a considerably damaged condition.

Had the journey been uninterrupted and the usual connections

made, the shipment would have arrived at destination early in the morning of the day next after it was shipped. The plaintiff had been engaged to open his show on Monday morning following the date of shipment at a county fair to be held at Philadelphia, Mississippi, and at the time the service was contracted for, the defendant, Illinois Central Railroad Company, was advised with respect to this situation, or rather that it was the plaintiff's desire to have the equipment in Philadelphia early on the following morning. In fact, the record discloses that several days before the shipment was made, the plaintiff advised the local agent at Covington of his desire for the service, stating in substance that his show would close in Covington on Saturday night, July 28, and that he desired to have a baggage car at Covington ready for loading after the close of his show on that night. As a result of this conversation, the local agent ordered from the traffic department of the carrier at Memphis a steel baggage car which was sent from Memphis to Covington ready for loading as had been requested. This was the customary procedure where such special service was required.

The acts relied upon by the plaintiff as constituting a deviation from the contract were and are: (1) the transfer of the property from one steel baggage car to two freight cars, and (2) the change in the mode of transportation from passenger service to freight service.

The defendants first contend that, having declared on the contract, the plaintiff could not be heard to say that there had been an abandonment of it or deviation therefrom.

It was averred in the declaration that the defendants had contracted to safely transport the property from Covington, Tennessee, to Philadelphia, Mississippi; that instead, through gross negligence, they had delivered the property in a damaged condition. In response to an order made under Code, section 8767, requiring them to plead their defenses specially, the defendants filed, among others, the special plea above mentioned.

After the replication originally filed to this plea had been stricken on motion of the defendants, and as the trial began, plaintiff's counsel stated to the court that he desired leave to file another replication admitting the execution of the special contract set up in the plea and averring that by their breach of the same the defendants had abandoned the limiting provisions thereof. We do not find the replication in the record but an order was made allowing it and it was treated as having been filed. Its legal sufficiency was not questioned and without objection the case proceeded to trial upon the issue thus made, the court saying, after allowing the replication, "come on with the proof."

Throughout the trial the pleadings were treated as sufficient to make an issue of fact with respect to whether, in handling the ⬚ent, there had been a substantial deviation from the type of ⬚e contracted for and, if so, whether the damage was sustained

during the course of that conduct. The question of law as to whether, if made, the deviation precluded the defendants from relying upon the provision of the contract set up in the special plea, arose on the motion for a directed verdict. So, notwithstanding irregularities, if any, in the pleadings, the parties tried the case below upon the theory that the determinative issue under the pleadings was whether the shipment had been handled by the carriers in such a manner as to preclude their reliance upon the limiting provision in the contract based on the agreed value of the property; and this being true, we think that it must be so regarded in this court. Compare: Anderson County v. Hays, 99 Tenn., 542, 42 S. W., 266, and Cannon v. Ewin, 18 Tenn. App., 388, 77 S. W. (2d), 990.

The motion of the connecting carriers conceded that the evidence was sufficient to show that the shipment had been handled in such a manner as to fasten liability upon them. So the only question presented in the trial court and the only question here, is with respect to the amount which the plaintiff was entitled to recover, and this, as above indicated, turns upon the question of law as to whether, under the undisputed evidence, viewed in the light most favorable to the plaintiff, the defendants can successfully invoke the provisions of the contract of carriage containing the agreed values and of the tariff authorizing its issue with respect to the basis upon which the carriers' liability was to be determined in the event of loss or damage.

■ ■ Upon this question the plaintiff relies upon the common law rule, supported by a long line of decisions, that if a carrier commits a breach of the contract of affreightment which goes to the essence of the contract, it is not entitled after such breach to invoke provisions of the contract which are in its favor. And in this connection it is well established that a carrier unjustifiably deviating from the customary route or mode or manner of transportation thereby creates such a breach of the contract. Numerous cases so holding are collected in a note appearing in 35 L. R. A. (N. S.), 1046, et seq. To these may be added Reynolds v. Adams Express Co., 172 N. C., 487, 90 S. E., 510, Ann. Cas., 1918C, 1071; The Sarnia, 2 Cir., 278 F., 459; Oliver Straw Goods Corp. v. Kaisha, 2 Cir., 47 F. (2d), 878, 74 A. L. R., 1378; Railroad v. Odil, 96 Tenn., 61, 33 S. W., 611, and Drake v. Railroad, 125 Tenn., 627, 148 S. W,. 214. See also: 9 A. J., 703 et seq., and 873 et seq; 10 C. J., 189 et seq.

It is first insisted by defendants that the evidence failed altogether to show any deviation in the contract by the carriers because (a) there was no contract made requiring the railroads to use a steel baggage car or to handle the property in passenger train service; and (b) under the contract the carriers were at liberty to use a box car or cars to transport the property by the most convenient train, either passenger or freight.

We are unable to assent to this view. It is true that the local

ticket agent of the Illinois Central Railroad stationed at Covington, Tennessee, did testify that under such a contract as that here in question it was not obligatory on the carriers to move by a passenger train the car contracted to be furnished, but that it was privileged to move it either by freight or passenger service, whichever was most convenient. It is also true that another agent of the Illinois Central Railroad connected with the traffic department and stationed at Memphis who appears to have been familiar with movements of this kind, testified that if the carriers were unable to provide a baggage car they had the option under the contract of substituting a box car. He also testified that shipments of this kind were classified as baggage, apparently meaning in contradistinction to freight. Incidentally the same witness testified that cars had to be constructed of steel before it was permissible for passenger trains to carry them and that it was customary to operate such cars on passenger trains.

However, we do not think it was within the province of either of these witnesses to construe the contract. That was a matter for the court and by the defendants' contention above referred to it is required of this court to determine whether the construction apparently placed on the contract by the trial judge was correct.

The meaning of the contract is to be ascertained from the words employed, the connection in which they are used, the subject matter and the evident purpose of the contract. St. Louis, I. M. & S. R. Co. v. J. F. Hasty & Sons, 255 U. S., 252, 41 S. Ct., 269; 65 L. Ed., 614. The object sought to be accomplished by the parties in making the agreement here involved was not only to move the property between the two points specified but to do so by means of a special type of service as distinguished from the ordinary service, such as freight service, usually employed by the carrier to move property in carload lots;—a service better suited to the nature of the property and the accomplishment of the plaintiff's above stated objective that made its quick and safe transportation necessary.

It is a matter of common knowledge that there is a radical distinction between the freight and passenger service furnished by common carriers by rail. The distinction is evident throughout an organization of such a carrier not only with respect to the type of equipment used and the expense and convenience involved but in numerous other fundamental respects. Freight service is devoted primarily to the transportation of property and when, as is sometimes the case, persons are transported by this service it is only as a necessary incident to the primary purpose. Upon the other hand passenger service is devoted primarily to the transportation of persons, with the transportation of property ordinarily a mere incident thereto. A movement by freight service is ordinarily cheaper, slower, more uncertain and more hazardous than a movement by passenger service.

The service by which property is ordinarily moved as an incident

to the transportation of passengers is commonly known as "baggage service" and relates to the transportation of property by passenger service or its equivalent. The charge therefor up to a certain weight limit is covered by the fare charged the passenger for his personal transportation.

The courts have not undertaken to define the term "baggage" with precision and it is not necessary to do so in this case. In general, however, the term is employed to designate property of a passenger carried for his use and convenience while on a journey or for the accomplishment of the purposes of a journey. Coward v. East Tennessee, etc., Railroad, 84 Tenn., 225, 57 Am. Rep., 227. It is clear, however, that the question of what will constitute baggage, and a fortiori the question of what is meant by "baggage car service", is largely dependent upon the circumstances in each case. 10 Am. Jur., 434. What has just been said relates to regular baggage service afforded by common carriers.

Realizing, no doubt, that the nature of some enterprizes, among them the show business, require, in the transportation of property in connection with the transportation of passengers, a speedier and safer movement of property than is afforded by the ordinary freight service and that the regular baggage service was for a number of reasons inadequate for that purpose, the carriers, with the approval of the Interstate Commerce Commission, have provided for a "special baggage car service" which is obviously a mere amplification of the regular baggage car service. This is provided for by a tariff purporting on its face to be a joint passenger tariff prescribing charges, rules and regulations applying in connection with the movement of special passenger cars, special baggage cars, special trains, etc. The special baggage car service is furnished as an incident to the purchase of passenger transportation for a given number of persons, as, for instance, in the present case the service was furnished in consideration of the purchase by the plaintiff of passenger transportation for 20 persons from the point of origin to the point of destination. Among the provisions of the tariff which to our mind indicates, by implication at least, that the service in question is a mere extension of the regular baggage service, is the following: "Property transported in special baggage car, or cars, will not be checked, or weighed or subject to charges for excess weight, or restrictions as to maximum weight or size, contained in tariffs covering the transportation of similar property in regular baggage car service."

The contract authorized by the tariff and issued in the instant case itself bears the heading, "Special Baggage Car Contract", and the language used leaves no doubt that the issuing carrier on behalf of itself and connecting carriers agreed to furnish the plaintiff a baggage car in which to load his property and to transport the loaded car between the points mentioned.

It is of significance that the agreement was not that the carriers would transport the property, leaving to them the choice of the means to be employed, as is ordinarily the case with a movement by freight service, but that they agreed to furnish "special baggage car service" consisting of one car (the number of cars is left blank in the contract but it is shown without controversy that the agreement was to furnish only one), "to be moved between the following points via the following routes", etc. In practical effect the plaintiff chartered a particular car which the carrier agreed to transport by a particular type of service, and the agreement to furnish that type of service as distinguished from the ordinary service used to transport property was of the essence of the contract.

Without intending to lay down inflexible and inclusive definitions of the terms, it may be said that a baggage car, as commonly understood, is a closed car in a passenger train, used to transport the property of the passengers, and "baggage car service," as commonly understood, means a service rendered in such a car in connection with the transportation of passengers by a passenger train movement or its equivalent.

Applying established canons of construction, we find nothing in the contract or the tariff under which it was issued to warrant the view that a movement by a freight train in separate freight cars is a movement by the "special baggage car service" that the defendants agreed to furnish. We think the contrary is true.

In its last analysis the defendants' contention upon this phase of the case is that for the rate charged the carriers had the right at their option to furnish any kind of equipment and any kind of service that might best suit their own ends. We think this could not be true, for obviously it would open the door to gross discrimination between patrons. To one they might furnish passenger service in a steel baggage car. This was certainly authorized by the tariff. To another paying the same charge they might furnish freight service in a wooden box car or any other kind of comparatively inferior equipment, with all of the greater hazards and delays incident to such service.

The type of service contracted to be performed was a part of the rate established by the public tariff and the carrier could not lawfully furnish any other kind of service and charge that rate for it. 9 Am. Jur., 532, 559, 568.

It is next insisted that the transfer of the property from a steel baggage car, which was being hauled by a passenger train, to two freight cars in a freight train, did not constitute a deviation from the contract within the meaning of the rule invoked by the plaintiff.

No authority is cited to support this view. Upon the other hand we think that the authorities above referred to fully demonstrate

that the contrary is true. For instance in one of the texts cited it is said: "In general, a deviation may be defined as a voluntary departure without necessity or reasonable cause from the regular or usual route, or from a stipulated or customary mode of carriage." 9 Am. Jur., 704, Sec. 471.

This statement is followed by illustrations of the application of the rule, among them being, that the forwarding of a shipment by one train or coach when it has been agreed it shall be forwarded by another is a deviation; that to transport a shipment by freight instead of passenger train or express service may be a deviation and so to transfer goods from one car or vessel to another.

Cases so holding are cited in notes to the text. To these may be added Pavitt v. Lehigh Valley R. R., 153 Pa., 302, 25 A., 1107, wherein it was held, that carrying property by a freight train which the carrier had agreed to take by a passenger train constituted a deviation from the contract, giving the shipper the right to hold the carrier to its common law liability free from contractual exemption.

Moreover, our own Supreme Court, while it did not have for decision the question before us, in Drake v. Railroad, 125 Tenn., 627, 148 S. W., 214, 217, did quote with approval from 4 Elliott on Railroads (2 Ed.), Sec. 1449a, page 108, as follows:

"The carrier cannot violate a contract, and at the same time claim the benefit of such contract; and, whether it is the initial carrier, or an intermediate carrier, it may become liable for the loss of the goods, or injury thereto by its succeeding carrier, where in the absence of an emergency, and without any necessity, it has deviated from the route prescribed by its contract or instructions, and forwarded the goods over another route or in another manner."

See also Railroad v. Odil, 96 Tenn., 61, 33 S. W., 611.

It is insisted, however, that the evidence shows that the property was damaged while in the baggage car in a wreck at New Albany, Mississippi, and thereafter transfered to freight cars and carried by a freight train to destination; that therefore in legal contemplation the situation was not and could not have been affected by the fact that the damaged property was carried to destination by freight service or otherwise.

We do not think there is any basis in the evidence for this contention. It is true that plaintiff was permitted to testify without objection that when he car failed to arrive at the expected time he inquired of the local agent at the destination of the shipment and was informed "that they had a wreck at New Albany, Mississippi," and that the transfer of the property from the baggage car to the freight cars had occurred at that point. This testimony was hardly competent (see 20 Am. Jur:, 510, Sec. 599, and 2 Wigmore on Evidence, Sec. 1078), but having been admitted without objection it may be that it ought to be considered for what it is worth.

Ehrlich v. Weber, 114 Tenn., 711, 88 S. W., 188. However, even if this be the proper course and the testimony be given full credence, it does not prove or tend to prove what the defendants assume it does; and there was no other evidence on the point. It does not show either that the property was damaged in the wreck or, if so, that it was in the steel baggage car at that time.

 As already stated, it was shown that the shipment was loaded at the point of origin in a steel baggage car furnished by the initial carrier; that this car left that point by a passenger train but that the property arrived at destination by freight service, loaded in two freight cars. We are satisfied that a prima facie case of deviation within the meaning of the rule above referred to was thus made out, placing upon the defendants the burden of exonerating themselves from the consequences thereof. They made no attempt to justify the change in the type of service, and, having it in their power to explain the circumstances tending to exonerate them, it would have been permissible for the jury to have inferred that, if fully developed, the circumstances would have shown a deviation in the respect mentioned rather than the contrary. Western Union Tel. Co. v. Lamb, 140 Tenn., 107, 203 S. W., 752.

The final and principal contention, strongly and ably pressed, is that the contract of shipment having been entered into pursuant to a published tariff on file with the Interstate Commerce Commission, none of its provisions could be waived or abandoned by conduct or otherwise.

As above indicated, in the present plight of the record, bearing in mind that we are passing upon the propriety of a directed verdict that was in form for the plaintiff but in effect one in favor of the two defendants, the question is to be determined upon the assumption that there was an unjustifiable deviation from the contract by the defendants within the meaning of the rule above referred to which at common law would have precluded reliance upon the provision of the contract invoked by the carriers with respect to the basis of their liability.

 Congress has legislated directly upon the subject of a carrier's liability for loss of and damage to interstate shipments and the federal legislation on the subject is supreme and exclusive. The decisions of the Supreme Court of the United States dealing therewith are entitled not only to deference but explicit obedience and that, of course, we cheerfully yield.

But the precise question arising upon the factual situation with which we are confronted, not having been passed upon by that Court nor by our own Supreme Court so far as we have been able to discover, it becomes our duty to construe the decisions dealing with the principle for the purpose of determining whether they are applicable to the question presented by the facts of the present case.

It is, of course, not open to question that the federal legislation regulating interstate commerce, and the tariffs, rules and regulations promulgated pursuant thereto, constitute the contract between a shipper and a carrier covering the transportation of interstate shipments. Nor can there be any doubt about the general proposition that such a contract cannot be altered or amended either by an agreement or by conduct of the parties that would operate as a discrimination or as a deviation from the responsibility so placed upon the carrier in the performance of the service required by the contract.

The cases so holding are innumerable. Many of them were cited and reviewed by Mr. Justice Green in the case of Southern Railway Co. v. Lewis & Adcock Co., 139 Tenn., 37, 201 S. W., 131, L. R. A., 1918C, 976.

The defendants chiefly rely on the case of Georgia, F. & A. Railway Co. v. Blish Milling Co., 1916, 241 U. S., 190, 36 S. Ct., 541, 544, 60 L. Ed., 948, and very earnestly insist that it is in point and controlling. In that case the action brought against the delivering carrier was technically in trover but was treated as one for damages based on the misdelivery of an interstate shipment of flour.

The defendants plead a provision of the bill of lading exempting the contracting carriers from liability in case of failure to make delivery unless a claim therefor should be filed within four months after a reasonable time for delivery had elapsed.

Notwithstanding its conclusion that this provision had not been complied with, the Court of Appeals of Georgia, 15 Ga. App., 142, 82 S. E., 784, affirmed a judgment for the plaintiff on the ground that, ''according to the allegations of the petition the contract was abandoned and repudiated by the defendant; and the defendant could not thereafter insist upon the stipulation in the bill of lading as to the time within which claims for damages should be presented.''

Taking a view contrary to that of the state court upon this phase of the case, the Supreme Court of the United States, afer having held that the provision of the bill of lading relied on by the carrier applied as well to a misdelivery as to a failure to make delivery occasioned by loss or destruction of the shipment, said:

''It is urged, however, that the carrier, in making the misdelivery, converted the flour and thus abandoned the contract. But the parties could not waive the terms of the contract under which the shipment was made pursuant to the Federal Act; nor could the carrier by its conduct give the shipper the right to ignore these terms which were applicable to that conduct, and hold the carrier to a different responsibility from that fixed by the agreement made under the published tariffs and regulations. A different view would antagonize the plain policy of the act and open the door to the very abuses at which the act was aimed. Chicago & A. R. R. v. Kirby,

225 U. S., 155, 166, 32 S. Ct., 648, 56 L. Ed., 1033, 1038, Ann. Cas., 1914A, 501; Kansas City So. Ry. v. Carl, supra [227 U. S., 639, 33 S. Ct., 391, 57 L. Ed., 683]; A., T. & S. F. Ry. v. Robinson, 233 U. S., 173, 181, 34 S. Ct., 556, 58 L. Ed., 901, 905; Southern Ry. v. Prescott, supra [240 U. S., 632, 36 S. Ct., 469, 60 L. Ed., 836].''

To the same effect is the decision of our own Supreme Court in the case of Southern Railway Co. v. Lewis & Adcock Co., supra, wherein it was held that a provision in a bill of lading covering interstate shipments, to the effect that no carrier should be liable for loss occurring other than on its own line, could not be waived by an agreement, by the delivering carrier on whose line the loss did not occur, to pay the damage, the reason being that the agreement was unenforceable as a discrimination against uniformity of responsibility required of carriers of interstate commerce.

To the same general effect are the cases of Richter & Sons v. American Express Co., 1917, 180 Iowa, 1037, 164 N. W., 228, L. R. A., 1918A, 749, and Metz Co. v. Boston & M. R. R., 1917, 227 Mass. 307, 116 N. E., 475.

We understand the defendants'. contention to be that the above quoted comprehensive language of the Court in the Blish case is broad enough to cover every situation and that there can be no circumstances under which the carrier of an interstate shipment can be held to a different responsibility than that fixed by the published tariffs providing for the contract under which the shipment originates.

We are unable to assent to this view.

In holding that the terms of a transportation contract could not be waived by a carrier by its conduct, we do not think the Court in that case intended to go as far as the defendants contend; nor does any other case which we have found go to that length.

The provision of the contract, involved in the Blish case, that was alleged to have been abandoned, covered, and was intended by the parties to cover, the very act, namely, the misdelivery of the flour, that was relied upon as constituting an abandonment or waiver of the provision. To our minds the language above quoted indicates that in announcing the principle that a carrier could not by its conduct waive a valid contractual provision, the Court had reference to the terms of a contract, to use the language of the opinion, ''which were applicable to that conduct''; that is, to the conduct of the carrier relied upon as constituting a waiver or abandonment. The Court did not say, and we think did not mean, that a provision of a contract in no wise applicable to the conduct relied upon as working an abandonment, could not be waived or abandoned by a resort by a carrier to a radically and fundamentally different course than that to which the agreement alleged to be waived related—a course of action not in contemplation of the parties as a possibility at the

time the agreement was made—one forming no part of the basis of the published rate charged, and hence wholly without the protection of the contract.

Shortly stated, the contracting parties in the Blish case contemplated as a possibility the conduct relied upon as a waiver and provided for the circumstance under which the carrier in that event would be liable for the resulting loss, whereas that, we think, cannot be said to be true in the case before us.

These considerations indicate what we conceive to be the vital distinction between the two cases.

This view is fully supported by the North Carolina case of Reynolds v. Express Company, supra, which is a leading case on the question under consideration and in all material respects directly in point on the facts. The opinion is well reasoned and sound and we have been content to follow it: See also McKahan v. American Express Co., 209 Mass., 270, 95 N. E., 785, 35 L. R. A., N. S., 1046, Ann. Cas., 1912B, 612, and note.

It is not amiss to note that a review of the North Carolina case by the Supreme Court of the United States was sought and writ of error dismissed for want of jurisdiction as reported in Adams Express Co. v. Reynolds, 248 U. S., 548, 39 S. Ct., 183, 63 L. Ed., 416.

The distinction above mentioned is illustrated by those cases dealing with the liability of a carrier who has confiscated a shipment as, for instance, a shipment of coal, and used the property itself. In such case it is held that a provision in a bill of lading limiting the value of the property, has no application. Norfolk &. W. R. Co. v. Nottingham & Wrenn, 1924, 139 Va., 748, 124 S. E., 398; Dexter & Carpenter v. Davis, 4 Cir., 1922, 281 F. 385.

Other cases dealing with the principle are collected in the notes found in L. R. A., 1918A, 756, and 56 A. L. R., 1171, 1179.

The view we have adopted we think, inferentially at least, finds warrant in the language of the Court in American Railway Express Co. v. Levee, 1923, 263 U. S., 19, 44 S. Ct., 11, 13, 68 L. Ed., 140, decided subsequently to the Blish case. In that case it was held that a stipulation in a bill of lading for limitation of liability is effective "unless the plaintiff should prove some facts that took the case out of the protection of the contract." To our minds, the clause quoted indicates a recognition by the Court that there might be facts shown with respect to the handling of an interstate shipment that would preclude the carrier from invoking provisions of the contract beneficial to it after having voluntarily and unjustifiably abandoned its obligations thereunder.

The defendants' very earnest and able argument upon this phase of the case is bottomed upon the proposition that the agreement limiting the carrier's liability, having been a consideration for the reduced rate charged, became a part of the rate and that to hold

the carriers to a greater responsibility would be an unlawful discrimination against those electing to pay a higher rate for the same service but without the agreement limiting liability. In considering this contention it is, we repeat, to be borne in mind that the question presented is to be determined upon the assumption that the change from the special baggage car service contracted for, to freight service was unjustified, and also that, presumably, it was done solely to serve the defendants' own ends and hence was to their advantage either from the standpoint of expense, convenience or in some other substantial particular.

Conceding the correctness of the general principle invoked by the defendants, we think the argument made in support of its application to the situation before us overlooks the fact that the defendants did not render the service for which plaintiff paid and which was as much a part of the published rate as was the agreement limiting liability. The contract to furnish a special type of service was, we think, no less a consideration for the limiting agreement than was the reduction in the rate; for it is readily understood how a shipper would consent to a limitation on the liability of a carrier, believing that his property would be transported by a special and relatively safe means, but would not do so if the type of service to be furnished involved a substantially greater risk of loss or damage.

It is true that under a view contrary to that contended for by the defendants the carriers would be held to a greater responsibility than was contemplated in fixing the rate charged for the service contracted for; perhaps to the same degree of responsibility as would have existed had a higher rate been charged on account of the fact that no limiting agreement was made. But we think no unlawful discrimination would follow. As stated, the special service forming a substantial part of the basis of the rate charged was not rendered in the instant case. Instead, a radically different and more hazardous service was substituted, presumably to the advantage of the defendants. Unless it is unreasonable or unjust, discrimination with respect to rates charged is not forbidden by the Interstate Commerce Act, 49 U. S. C. A., Sec. 1 et seq. United States v. Illinois Central R. R. Co., 263 U. S., 515, 44 S. Ct., 189, 68 L. Ed., 417; 9 Am. Jur., 558, Sec. 205. It is also said in the same section of that text that "the rule of equality is in force only where the service performed in the different cases is substantially the same and the circumstances and conditions are similar." We think it cannot be said to be either unjust or unreasonable for a carrier, who, by agreeing to render a special type of service induced a shipper to agree upon a limitation of liability, to be held to be precluded from relying on that agreement when it appears that, presumably to serve its own ends, it rendered a radically different and more hazardous type of service not desired by the shipper or in contemplation of the parties at the time the agreement was made.

It is plausible, at least theoretically, that in such a case the increased responsibility to which the carrier is held would be justified by the advantage presumably accruing to it by reason of the substitution of a type of service different from that it agreed to render; that the inequality in the rates charged one who did and another who did not make an agreement with respect to the value of the property, would be counterbalanced by the inequality in the respective types of service rendered.

We think the rule contended for by the defendants, if applied to factual situations such as that before us, instead of preventing unlawful discriminations, would sanction them; for under it, as above pointed out, a carrier could at its election furnish one patron with special service forming the basis for a rate and to another paying the same charge and complying with the same requirements a different and inferior type of service. That such a result is forbidden is too clear for argument. 9 Am. Jur., 332.

In the instant case, in agreeing that the released values specified in the contract and provided for in the published tariffs should form the basis of the defendants' liability in the manner provided for in the event of loss or damage, we think what the parties meant and the framers of the tariff intended, was that the basis thus fixed should govern with respect to loss or damage resulting from risks incident to transportation and delivery by the service agreed upon, namely, baggage car service and that as already said, it was never contemplated that that provision had any reference to loss or damage to the property as a result of being subjected to the greater hazards and vicissitudes of a radically different type of service. McKahan v. American Express Co., supra; Reynolds v. Express Co., supra.

As above indicated, our view is, that the rate fixed in the published tariffs and charged the plaintiff in the instant case was based no more upon the agreement limiting the carriers' liability than upon the agreement that the property would be transported by a particular type of service, and the fact that that service, being of the essence of the contract, was not rendered, leaves, under the facts of this case, no sound basis for the argument with respect to a possible unlawful discrimination.

As suggested by the North Carolina court in Reynolds v. Express Co., supra, if the effectiveness of the salutary provisions of the federal legislation enacted to prevent discrimination is in any way threatened by the view expressed in that case, which we have adopted, it could be the better preserved by requiring the carrier in making settlement to adjust its charges on the basis of the responsibility to which it is held and the character of service actually rendered. If it should be deemed necessary to pursue it, which we do not hold to be the case, we think this course would be much more in keeping with

common justice than that which the view urged by the defendants would require.

The practice followed by two of the defendants in the trial court in connection with the motion for a directed verdict is novel. While in form a motion for a directed verdict for plaintiff, it was in substance a motion for a directed verdict in favor of those defendants on the issue raised by their special pleas setting up the contractual limitation of liability. For the reasons we have indicated, we think the trial judge erred in granting this motion.

The plaintiff also assigns error on the action of the trial judge in directing a verdict in favor of the other defendant, the Illinois Central Railroad, and dismissing the suit as to it. The verdict as to this defendant was directed presumably on the theory that the other two defendants conceded responsibility for the damage sustained and they being before the court, the Illinois Central Railroad should be acquitted notwithstanding that otherwise, it, as the initial carrier, would have been liable by virtue of the Carmack Amendment, 49 U. S. C. A., Sec. 20 (11, 12).

While under our rules we reserve the right to pass on any question arising on the record of a case before us, whether raised or argued by the parties or not (see 17 Tenn. App., Appendix Rule 12, p. IV), we are not disposed to pass on the assignment of error challenging the last mentioned action of the trial judge because it is supported neither by brief nor argument. In such a situation we are at liberty to treat the question so raised as having been abandoned, and this we do. Compare McDonnell v. Amo, 162 Tenn., 36, 34 S. W. (2d), 212 and State ex rel. v. Retail Credit Men's Ass'n, 163 Tenn., 450, 470, 43 S. W. (2d), 918, 923.

The result is that the judgment as to the defendant, Illinois Central Railroad is affirmed. As to the other two defendants the judgment is reversed and the case remanded for a new trial. The costs of the appeal will be paid by the last mentioned defendants and the costs of the trial court will abide the event of another trial.

Senter and Ketchum, JJ., concur.