MIGUEL FIRPI, demandante y recurrido, *v.* PAN AMERICAN WORLD AIRWAYS, INC., demandada y recurrente.

*Número:* 359 *Resuelto:* 9 de octubre de 1963

198

*Hartzell, Fernández & Novas* y *Vicente M. Ydrach,* abogados de la recurrente; *Francisco Fernández Cuyar,* abogado del recurrido.

200

*Hartzell, Fernández & Novas* y *Vicente M. Ydrach,* abogados de la recurrente; *F. Fernández Cuyar,* abogado del recurrido; *Ponsa Feliú, Calderón & Souss* y *Wilson F. Colberg,* abogados, respectivamente, de Eastern Air Lines y Caribbean Atlantic Air Lines, Inc., *amici curiae.*

Sala integrada por el Juez Asociado Señor Belaval como Presidente de Sala y los Jueces Asociados Señores Hernández Matos y Santana Becerra.

EL JUEZ ASOCIADO SEÑOR HERNÁNDEZ MATOS emitió la opinión del Tribunal.

Se trata de una reclamación interpuesta contra una porteadora aérea con motivo de la pérdida de ciertos artículos de joyería durante un viaje por avión entre San Juan y Nueva York, realizado el 13 de setiembre de 1958. La demandada fue condenada a pagar al demandante la suma de $9,625.00, las costas y $1,000 por concepto de honorarios de abogados.

El punto principal debatido es si procede aplicar a los hechos probados las disposiciones de la tarifa de pasajeros Núm. RR-3 de la Pan American World Airways, Inc., [1] aprobada por la Junta de Aeronáutica Civil.

Luego de un juicio en sus méritos el tribunal de instancia estimó debidamente probados los siguientes hechos:

El señor Miguel Firpi y su esposa llevaron a cabo con la Pan American un contrato de transporte mediante el cual esta última se obligó para con los primeros a transportarlos por avión, conjuntamente con sus aquipajes, directamente desde San Juan a la ciudad de Nueva York en consideración al pago de $357.00.

Para que fueran transportadas conforme al referido contrato, el demandante entregó y puso bajo el control de la demandada el equipaje que consistía de cinco maletas. A cambio, la demandada entregó al demandante las contraseñas correspondientes a cada maleta para que éste pudiera reclamarlas al llegar a Nueva York.

Partieron los esposos Firpi de San Juan en el vuelo 202 de la mañana del 13 de setiembre de 1958 arribando a Nueva York ese mismo día por la tarde. Una de las cinco maletas entregadas, perteneciente a la esposa del demandante, conteniendo prendas de vestir, otros objetos y joyas por valor de

---

[1] En adelante la llamaremos la Pan American.

$9,625.00, no le fue devuelta cuando presentaron ellos la contraseña correspondiente, recibiendo sin embargo las cuatro restantes.

Inmediatamente el demandante fue a las oficinas de la demandada en el aeropuerto de Idlewild en Nueva York e informó la desaparición de la maleta y éstos le contestaron que esperara los otros vuelos que venían de Puerto Rico, pues quizás estuviera en uno de ellos. Esperaron el próximo vuelo sin éxito alguno. Como ya era tarde, fueron al Hotel Essex House donde se hospedarían, dejaron su equipaje y regresaron al aeropuerto de Idlewild. En las oficinas del aeropuerto relacionadas con los objetos perdidos hablaron con el señor Lancey, jefe de las mismas, a quien le informaron que la maleta contenía joyas y objetos por valor de diez a quince mil dólares y tenía que aparecer.

De nuevo revisaron las maletas que habían llegado en otros aviones procedentes de Puerto Rico sin lograr localizar la que interesaban. Luego de ahí se dirigieron nuevamente a la oficina de "Objetos Perdidos" pero eran las 11:30 de la noche y la misma se encontraba cerrada. Hablaron entonces por teléfono internacional con su hijo en San Juan explicándole lo sucedido para que éste lo informara a las oficinas de la Pan American en el aeropuerto de San Juan, lo cual hizo.

El día siguiente (14 de setiembre de 1958) llamó el demandante bien temprano al aeropuerto de Idlewild, contestándosele que no había llegado la maleta. Entonces fue a las oficinas de la General Motors en Nueva York, habló con los abogados de ésta y desde allí llamaron a las oficinas de la Pan American en el aeropuerto de Idlewild urgiéndoles encontrar la maleta.

En el ínterin, la Pan American había enviado un mensaje de teletipo a todas sus oficinas y departamentos en Nueva York, Baltimore, Filadelfia, Boston, Washington, Miami, Antigua, Santa Cruz, Puerto España, Yorktown, Paramaribo, etc., dándoles una descripción de la maleta, el número del

boleto que la misma llevaba, el nombre del pasajero, el color de su cubierta y que la misma era extremadamente valiosa, para que informaran inmediatamente a Idlewild de su aparición, "ya que se encontraba descarriada (*misloading*) y que la devolvieran a dicho aeropuerto."

El mensaje de las 9:45 p.m. del 13 de setiembre fue contestado por el "traffic manager" de la demandada en Baltimore, el 14 de setiembre de 1958, a las 6:50 p.m. informando al departamento de objetos perdidos en San Juan y en Idlewild que la maleta del pasajero Miguel Firpi había sido recibida equivocadamente en Baltimore en el vuelo 214 del día 13 de setiembre, y puesta a bordo de un vuelo que iba para Idlewild con parada en Filadelfia; que ya debía de estar en el aeropuerto de Idlewild. Informó, además, que el boleto de la maleta (*baggage tag*) estaba marcado "vuelo 202" pero sin destino alguno.

El lunes 15 de setiembre, a las 5:50 p.m. el "traffic manager" de la demandada en Baltimore, en contestación a un telegrama dirigido a él ese mismo día a las 9:10 a.m. en relación con el vuelo 214 del día 13 de setiembre y la maleta del señor Firpi, "informó que definitivamente había sido enviada en dicho vuelo del día 13 y que preguntaran a Filadelfia las razones por las cuales habían manipulado con la maleta, aunque por error pudieron haberlo hecho, ya que la misma estaba mal dirigida (*mistag*)" y que la maleta había sido vista por última vez en Filadelfia y sólo ellos podían informarle lo que habían hecho con ella.

El martes 16 de setiembre de 1958 el demandante habló con el Sr. William H. Pace, Jr., administrador general de la Pan American en Nueva York, quien al ponerse en conocimiento de lo sucedido y del contenido de la maleta, llamó por teléfono al Sr. C. L. D'Gabriel para que se encargara del caso. El señor D'Gabriel les prometió hacer todo lo posible a su alcance por encontrar la maleta.

El miércoles 17 de setiembre por la mañana, el deman-

dante y su esposa recibieron un telefonema de las oficinas de objetos perdidos del aeropuerto de Idlewild en Nueva York comunicándoles que estaban muy contentos en dejarle saber que la maleta había sido localizada en Baltimore y que la mandarían en el próximo vuelo para Nueva York. El demandante le contestó que no mandaran la maleta al hotel, que la dejaran en Idlewild y que saldrían inmediatamente para recibirla, lo cual hicieron a toda prisa.

Al llegar ellos al aeropuerto de Idlewild no pudieron entregarles la maleta por no haberla recibido, no obstante haber sido localizada en Baltimore y vista por última vez en Filadelfia. Fue puesta a bordo del vuelo que iba para el aeropuerto de Idlewild y se volvió a extraviar en dicho trayecto sin que hasta ahora se haya vuelto a encontrar, habiéndola perdido para siempre el demandante con todo su contenido.

Además de prendas de vestir y otras pertenencias, la maleta perdida contenía las siguientes joyas:

| | |
|---|---:|
| "Diamond ring containing 1 diamond weighing approximately 4 cts. for | $4,000.00 |
| Diamond baguette ring for | 500.00 |
| Emerald and baguette diamond ring for | 400.00 |
| Ruby and baguette diamond ring for | 375.00 |
| 14 K. gold bracelet with pearls and diamonds | 500.00 |
| 14 K. gold pin and earrings to match for | 150.00 |
| 14 K. gold movado watch and attachment | 250.00 |
| Double strand of fine cultured pearls with diamond snap for | 1,500.00 |
| Diamond and pearl earrings to match necklace | 600.00 |
| 14 K. gold vacheron and constanting watch with gold wrist band (new) for | 800.00 |
| 1 collar de perlas cultivadas de dos vueltas con broche de diamantes | 300.00 |
| 1 medalla Madona de platino toda en alto relieve rodeada de perlas legítimas y diamantes con su cadena traída de España | 250.00 |
| Total | $9,625.00" |

Las conclusiones de derecho primeras exponen con claridad los principios legales que consideró aplicables al asunto. Ellas son las siguientes:

"La acción ejercitada está predicada en las disposiciones de los artículos 1802 y 1803(²) del Código Civil de Puerto Rico, preceptivas de que el que por acción u omisión cause daño a otro, interviniendo culpa o negligencia, está obligado a reparar el daño causado; no sólo por los actos u omisiones propias, sino por los de aquellas personas de quienes se deba responder.

"En el caso de autos, la demandada contrató la transportación del demandante y su esposa, y del equipaje de ambos, desde la ciudad de San Juan hasta la ciudad de Nueva York por determinada suma de dinero y en el mismo avión. En cuanto concierne al equipaje objeto de litigio, la demandada no cumplió dicho contrato. En lugar de transportarlo todo a la ciudad de Nueva York, puso parte en un avión distinto al que transportaba al demandante y su esposa y lo mandó a la ciudad de

(²) Consideramos que el precepto legal apropiado para tutelar la acción ejercitada es el Art. 1054 del Código Civil nuestro que dispone:

"Quedan sujetos a la indemnización de los daños y perjuicios causados, los que en el cumplimiento de sus obligaciones incurrieren en dolo, negligencia o morosidad, y los que de cualquier modo contravinieren al tenor de aquéllas."

Creemos que tienen aplicación analógica al caso los Arts. 273, 277 y 280 del Código de Comercio que dicen:

"Art. 273.—La responsabilidad del porteador comenzará desde el momento en que reciba las mercaderías, por sí o por medio de persona encargada al efecto, en el lugar que se indicó para recibirlas.

"Art. 277.—Si mediare pacto entre el cargador y el porteador sobre el camino por donde deba hacerse el transporte, no podrá el porteador variar de ruta, a no ser por causa de fuerza mayor; y en caso de hacerlo sin ella, quedará responsable de todos los daños que por cualquier otra causa sobrevinieren a los géneros que transporta, además de pagar la suma que se hubiese estipulado para tal evento.

"Cuando por la expresada causa de fuerza mayor el porteador hubiera tenido que tomar otra ruta que produjese aumento de portes, le será abonable este aumento mediante su formal justificación.

"Art. 280.—El porteador, sin embargo, será responsable de las pérdidas y averías que procedan de las causas expresadas en la sección anterior, si se probare en su contra que ocurrieron por su negligencia o por haber dejado de tomar las precauciones que el uso tiene adoptadas entre personas diligentes, a no ser que el cargador hubiese cometido engaño en la carta de porte, suponiéndolas de género o calidad diferentes de los que realmente tuvieren. . . ."

Baltimore, desde donde lo remitió a la ciudad de Filadelfia. La propia demandada reconoce en su Contestación a la demanda que 'por razones que ignora', la maleta del Sr. Firpi fue llevada a Baltimore en vez de Nueva York, y que al recibirse en Baltimore fue enviada a Filadelfia por la propia demandada pero 'por razones que también ignora', no obstante tener para entonces pleno conocimiento de que dicha maleta contenía joyas valiosas.

"Aún asumiendo la validez de las cláusulas que limitan a cierta suma la responsabilidad civil de la compañía aérea en caso de pérdida de equipaje, si el porteador viola dicho contrato enviando el equipaje a un punto o ciudad distinto al contratado por el pasajero, ciertamente no puede en justicia invocar las cláusulas limitativas de responsabilidad del propio contrato que así ha violado, como defensa contra la pérdida sufrida por el pasajero y la cual es ocasionada precisamente por el incumplimiento del porteador. Es doctrina casi universal la de que una parte que viola su contrato no puede invocarlo para ningún fin o propósito. Al no dar cumplimiento la demandada a su contrato transportando la maleta por otro avión y a otras ciudades que no eran la contratada, dichas cláusulas cesaron de operar o de surtir efecto legal alguno a favor de la demandada.

"Uniforme y reiteradamente se ha sostenido por los tribunales que cuando el porteador no cumple con los términos del contrato de transportación responde por la totalidad de los daños resultantes de tal incumplimiento, sin que pueda invocar o acogerse a aquellas cláusulas de dicho contrato por él violado que limitan pecuniariamente su responsabilidad, resolviéndose igualmente que el envío o remisión de la mercancía o equipaje a puntos distintos, o por ruta o medios distintos al contratado, afecta lo esencial del contrato de transporte y priva al porteador del beneficio de las cláusulas limitativas de su responsabilidad pecuniaria. Véanse: Calderón v. Atlas Steamship Co., 64 Fed. 874, 875, confirmado en 170 U.S. 272, 42 L.Ed. 1033; The Sarnia, 278 Fed. 459, 461–463; Sheldon Coast Co. v. Yukon Ind. Transport Co., 155 Fed. 29; St. Johns, etc. Shipping Co. v. Compañía General, 263 U.S. 119, 68 L.Ed. 201; Smith v. U.S. Shipping Board, 26 F.2d 337, 338–339 y Elliot on Railroads, Vol. 4, sec. 1656."

La recurrente señala la comisión de seis errores. En los dos primeros sostiene que ciertas conclusiones de hecho son

contrarias a la prueba; en el tercero, que se cometió error al no formular determinada conclusión; en el cuarto que se debió aplicar a los hechos probados la mencionada tarifa; en el quinto que la sentencia es contraria a la ley y en el sexto que era improcedente la imposición del pago de honorarios de abogados.

Solamente consideramos meritorios a los fines de su extensa consideración, dadas las circunstancias concurrentes en el recurso, los señalamientos cuarto y quinto. Carecen de importancia o son improcedentes los demás, según demostraremos al final de esta opinión.

Atendiendo a los términos del debate y las argumentaciones de las partes, la cuestión ha quedado centrada en determinar si hubo una desviación en el contrato de transporte y si la misma impide que la Pan American pueda ampararse en aquella parte de la tarifa que la exonera de toda responsabilidad por la pérdida de artículos de joyería que se transportan en sus aviones.

No negamos que la legislación federal que regula el comercio aéreo interestatal y las tarifas, reglas y reglamentos promulgados de acuerdo a esa legislación forman parte del contrato entre el remitente (*shipper*) y el porteador (*carrier*) que contratan la transportación aérea de pasajeros o propiedad entre Puerto Rico y los Estados Unidos. La Ley de Aeronáutica Civil incluye al definir "transportación aérea interestatal" el transporte entre un lugar de cualquier estado de los Estados Unidos y el Distrito de Columbia y cualquier lugar en un territorio o posesión de los Estados Unidos. 49 U.S.C.A. sec. 1301 (21). Expresamente estableció que: "Where not otherwise distinctly expressed or manifestly incompatible with the intent thereof, references in this chapter to possessions of the United States shall be treated as also referring to the Commonwealth of Puerto Rico." 49 U.S.C.A. sec. 1301-(29). Asimismo queda comprendido Puerto Rico dentro de la

definición de "comercio aéreo inter-estatal" según provee la Sec. 1301 (20) del mismo título.

La Ley de Aeronáutica Civil requiere que todo porteador radique ante la Junta de Aeronáutica Civil y mantenga abiertas a inspección pública tarifas conteniendo los precios, cargos y, hasta donde lo requiera la reglamentación de la Junta, que contengan toda clasificación, reglas, reglamentos, prácticas y servicios en conexión con la transportación. 49 U.S.C.A. sec. 1373.

■ Fue al amparo de la referida sección de la Ley que la Pan American radicó con la Junta de Aeronáutica Civil la Tarifa RR-3 que ahora invoca. Las disposiciones o declaraciones contenidas en tales tarifas, debidamente radicadas y aprobadas por la Junta, constituyen parte del contrato de transporte aéreo siendo válidas y obligatorias a las partes contratantes independientemente del conocimiento real que sobre ellas tenga el pasajero o remitente. The Journal of Air Law and Commerce, Vol. 29, No. 1, págs. 1-88, Winter 1963, *Tariff Limitations*, pág. 21. En *Lichten* v. *Eastern Airlines*, 189 F.2d 939 (1951) se dijo que bajo la doctrina de "jurisdicción primaria" la determinación en cuanto a la razonabilidad de la tarifa correspondía en primer término a la agencia administrativa pertinente y que las disposiciones de una tarifa debidamente radicada con la Junta y bajo su autoridad se consideran válidas hasta tanto no sean por ella revocadas.

■ Entre las cláusulas incluidas en el contrato de transporte en cuestión la Regla 18 de la Tarifa RR-3 radicada y aprobada por la Junta de Aeronáutica Civil contiene una mediante la cual la Pan American queda exenta de responsabilidad al transportar determinada clase de equipaje. Reza así la Regla 18 (H) :

"El porteador no es responsable por la pérdida, daño o tardanza en la entrega de artículos frágiles o perecederos, dinero, artículos de joyería, platería, documentos negociables, valores,

documentos mercantiles o muestras que estén incluidas en el equipaje que haya registrado el pasajero, ya sea con o sin el conocimiento del porteador."

Cuando el equipaje registrado consiste de otros artículos que no sean los mencionados en la Regla 18(H), mediante la Regla 18(E) se dispone que la responsabilidad del porteador queda limitada a $16.50 ó su equivalente por kilogramo, a menos que un valor mayor sea declarado por anticipado y sean pagados los cargos adicionales de conformidad con la tarifa del porteador. En tal evento la responsabilidad del porteador quedará limitada hasta el valor declarado. Se dispone, además, que en ningún caso la responsabilidad del porteador excederá la pérdida real sufrida por el pasajero.

La validez de disposiciones tarifarias limitativas de responsabilidad como la anterior ha sido consistentemente declarada por la jurisprudencia americana al decidir casos que tratan de transportación interestatal. 9 Am. Jur., pág. 664; *Randolph* v. *American Airlines*, 144 N.E.2d 878 (1956); *Vogelsang* v. *Delta Air Lines*, 302 F.2d 709 (1962). Empero, para que pueda el porteador invocar el amparo de esas disposiciones por razón del contrato de transporte celebrado, es necesario y fundamental que haya observado en su cumplimiento aquellos términos y condiciones que afectan directamente la esencia de la transacción llevada a cabo. *McKahan* v. *American Express Company*, 35 L.R.A. 1046 (1911) y otros allí citados.

Un porteador público que sin justificación se desvía de la ruta de transporte pactada claramente contraviene las obligaciones del contrato. Al así actuar queda privado de invocar aquellas partes del contrato que en su favor han sido establecidas. *Ward* v. *Gulf M. & N. R. Co.*, 134 S.W.2d 917, 922 (1938). Por consiguiente, estará impedido, bajo esas circunstancias, de invocar el beneficio de una estipulación eximente de responsabilidad. 9 Am. Jur., *Carriers*, sec. 476, págs. 707, 708.

■ La Pan American se obligó a transportar directamente de San Juan a Nueva York al señor Firpi y esposa conjuntamente con el equipaje de ambos. No obstante, la maleta cuya pérdida originó este litigio, fue colocada y enviada en un avión distinto y con distinta ruta a aquél en que viajaban el recurrido y su esposa. No se ha ofrecido prueba de clase alguna que justifique tal actuación por parte de la recurrente. Esa conducta representa un alejamiento o desviación sustancial de la manera en que mediante un acuerdo previo habría de ejecutarse el contrato. Se sometió parte del equipaje en cuestión a un riesgo mayor que el que tuvieron en mente las partes al momento de la celebración del contrato. 33 A.L.R.2d, *Carriers-Deviation*, págs. 155, 156, 217, 222.

Para sostener que no ocurrió tal desviación, la parte recurrente cita en apoyo la Regla 9 (b) de la Tarifa RR-3 que se refiere al "movimiento del equipaje." Dispone así la Regla 9 (b) :

"El equipaje registrado *será transportado en el mismo avión del pasajero a menos que de acuerdo con el porteador tal transporte se considere impráctico,* en cuyo evento el porteador moverá el equipaje al próximo precedente o subsiguiente vuelo en que haya espacio disponible." (Énfasis suplido.)

Arguye que concediendo la tarifa, mediante la referida regla, el derecho de enviar el equipaje en el próximo vuelo subsiguiente en que hubiese espacio disponible, no violó el porteador el contrato de transporte al enviar la maleta en el próximo vuelo. No podemos convenir con ello. Al interpretar la Regla 9 (b) no podemos concluir que signifique una renuncia implícita por el pasajero al derecho otorgádole por el *mismo contrato* a que su equipaje fuera enviado *por la ruta pactada.* Debemos interpretar esa cláusula siempre en armonía con la intención manifiesta de las partes al momento de su celebración. La Pan American se obligó a transportar el equipaje directamente desde San Juan hasta Nueva York. Así lo aceptó en su contestación al admitir las alegaciones con-

tenidas en el párrafo primero de la demanda. La prueba no demostró la existencia de algún pacto en contrario o la imposibilidad de su incumplimiento.

Al conceder la Regla 9 (b) el derecho al porteador de enviar el equipaje en el subsiguiente vuelo, lo hace teniendo siempre como supuesto insoslayable la ruta originalmente acordada, a tono con su parte primera que dice: "El equipaje registrado será transportado en el mismo avión del pasajero."

Hemos indicado que el tribunal sentenciador concluyó que habiéndose desviado la Pan American del contrato no podía al mismo tiempo ampararse en las cláusulas que la exoneraban de responsabilidad y que de haber ocurrido la pérdida de la maleta en el trayecto directo de San Juan a Nueva York, tal y como lo contemplaba el contrato de transporte, no hubiese estado impedida la demandada de invocarlas. Actuó correctamente al determinarlo así.

En *Ward* v. *Gulf*, supra, se hace una magnífica disertación sobre un punto análogo al que ahora consideramos. Estaba envuelta allí una legislación federal que regulaba la transportación ferroviaria. Transcribimos de la página 928 una parte de la opinión pertinente:

"En el caso presente, al estar de acuerdo que los valores relevados por especificación del contrato y de las tarifas publicadas debían formar la base para la responsabilidad del demandado en caso de daño o pérdida, creemos que lo que las partes quisieron decir y los que estructuraron las tarifas intentaron fue que esa base así fijada debiera gobernar con respecto a las pérdidas o daños resultantes de los riesgos *incidentales* a la transportación y entrega mediante el servicio pactado. . . . *en ningún momento se contempló que la provisión hacía alguna referencia a la pérdida o daño a la propiedad como resultado de haber estado sujeta a los mayores riesgos y vicisitudes que conlleva un tipo de servicio radicalmente diferente.*" (Énfasis suplido.)

En ese caso de *Ward*, el demandado argumentó que la limitación de responsabilidad en beneficio del porteador habiendo sido establecida en consideración a las tarifas bajas

que se cargaban, vinieron a ser parte de la tarifa publicada y que imponerle mayor responsabilidad constituiría una discriminación ilegal contra aquellos que eligen pagar tarifas más altas por el mismo servicio pero sin el acuerdo limitativo de responsabilidad. De esta manera respondió el tribunal a la contención del demandado (pág. 927):

"El argumento ignora el hecho que los demandados no rindieron el servicio por el que pagó el demandante y que era tan parte de la tarifa publicada como lo era el acuerdo limitativo de responsabilidad. *El contrato para proveer un tipo de servicio especial no era menor consideración para el acuerdo limitativo de responsabilidad que lo que lo era la reducción en las tarifas;* por esto es que se puede comprender cómo un remitente (*shipper*) consentiría a una limitación en la responsabilidad del porteador bajo la creencia de que su propiedad habría de ser transportada por los medios especiales y relativamente seguros, pero que no lo haría si el tipo de servicio a proveerse envuelve un riesgo sustancial de pérdida o daño.

" . . . . . . .

"La regla de igualdad tiene fuerza únicamente cuando el servicio realizado es sustancialmente el mismo y las circunstancias y condiciones son similares (9 Am. Jur. 558, sec. 205).

"Es plausible, al menos teóricamente, que el aumento en la responsabilidad impuesta al porteador estará justificado por la ventaja que presumiblemente obtiene por razón de la sustitución en el tipo de servicio diferente del acordado a rendir; que la inigualdad en las tarifas cargadas a uno que convino el acuerdo respecto al valor de la propiedad y a otro que no lo pactó se compensará por la inigualdad en los respectivos tipos de servicios rendidos.

"Creemos que la regla sostenida por los demandados si se aplicara a situaciones de hechos como la que tenemos ante nosotros, en lugar de prevenir discrímenes ilegales los sancionaría, ya que bajo ella, como hemos apuntado, un porteador podría a su elección proveer en un caso un tipo especial de servicio constituyendo la base para una tarifa y a otro pagando el mismo cargo y cumpliendo con los mismos requisitos un tipo de servicio diferente e inferior." (Énfasis suplido.)

En *The Sarnia*, 278 Fed. 459 (1921), el conocimiento de embarque *(bill of lading)* disponía que los materiales objeto del transporte fuesen colocados bajo cubierta. Una cláusula del contrato limitaba la responsabilidad del porteador a $100 por cada paquete. Los materiales fueron transportados sobre cubierta y como consecuencia sufrieron serios daños debido al tiempo borrascoso experimentado durante el viaje. El tribunal encontró que mediante esa conducta el porteador violó de manera crasa su contrato, lo que le impedía invocar la cláusula en su favor. Tomamos de la página 463:

". . . *el remitente al fijar la cantidad en la cláusula toma en consideración el riesgo al que serán expuestos sus bienes y la manera del transporte.* El hecho de que los bienes serían transportados bajo cubierta estuvo entendido entre las partes y es tan parte de la cláusula de valoración como lo es de cualquiera otra incluida en el conocimiento de embarque. . . . Al fijar el valor el remitente indudablemente fue influenciado por el hecho de que los bienes serían transportados bajo cubierta y que no estarían expuestos a los peligros que conlleva la transportación sobre cubierta." (Énfasis suplido.)

En *American Railway Co.* v. *Levee*, 263 U.S. 19, 21 (1923), donde estaba en consideración una cláusula limitativa de responsabilidad al amparo de unas tarifas aprobadas por la Comisión de Comercio Interestatal, en parte se dijo:

"Bajo la ley de los Estados Unidos que gobierna el comercio interestatal la estipulación constituye una defensa contra la responsabilidad más allá de cincuenta dólares, *a menos que el demandante logre probar algunos hechos que saquen el caso fuera de la protección del contrato.*" (Énfasis suplido.)

La recurrente cita con empeño lo resuelto en *Lichten* v. *Eastern Airlines*, supra. En ese caso la demandante contrató la transportación aérea para su persona y equipaje de Miami, Florida, a Filadelfia, Penn. De las dos maletas que incluyó en el equipaje sólo una le fue entregada al llegar ella a Filadelfia; la otra maleta permaneció erróneamente en el avión que continuaría vuelo hacia Newark, New Jersey. En New Jersey

fue entregada la maleta a una persona desconocida. A pesar de que posteriormente le fue devuelta. *Lichten* instó acción alegando que al serle entregada faltaban de la misma artículos de joyería por valor de $3,187.95. Una estipulación en el contrato disponía que artículos de joyería, entre otras cosas, serían transportados a riesgo del pasajero.

Convenimos con el Tribunal Superior en que el caso de *Lichten* ratifica la doctrina general de que una desviación en el cumplimiento del contrato priva al porteador del beneficio de las cláusulas limitativas de responsabilidad. No obstante reconocer la doctrina sostiene que es inaplicable a los hechos allí probados.

De una lectura detenida del caso de *Lichten* se podrá notar que el lenguaje utilizado refleja la idea de que no toda desviación del contrato debe dejar sin efecto la cláusula limitativa de responsabilidad. El tribunal resolvió que hubo una desviación pero que la misma no era suficiente como para impedir que el porteador invocara las cláusulas exculpatorias. Esa determinación no es contraria a los principios que hemos discutido; sólo indica la dificultad con que muchas veces se encuentra el juzgador al tratar de determinar lo que constituye una desviación de carácter impediente para el porteador. Lo que en un caso puede ser una desviación que impida al porteador invocar las cláusulas del contrato en su favor establecidas, en otro puede no serlo. "La propiedad de una desviación en particular es una cuestión de hecho de acuerdo a cada caso y no existe una fórmula fija para tal determinación." 33 A.L.R.2d, pág. 159.

En el caso de *Lichten* concurren hechos que lo hacen completamente distinguible del presente y que con toda probabilidad fueron un factor de gran peso en la determinación final del tribunal. La distinción descansa en que allí se trataba de equipaje que era transportado más allá de su destino (*overcarriage*), mientras que en el que consideramos se trata de sustitución de la ruta pactada en el contrato.

Creemos que el caso ante nos, a diferencia de la situación de *over-carriage* del caso de *Lichten,* refleja un grado de incumplimiento tal, conforme a los términos del contrato que lo hace merecedor de un tratamiento distinto.

No hay duda que en el caso de *Lichten* el cumplimiento del contrato se efectuó de manera sustancial. Ya todo el equipaje, al igual que la demandante, había llegado a su punto de destino. Hasta ese instante la compañía había dado sustancial cumplimiento al contrato. Fue de ahí en adelante que se apartó del mismo, pero no lo suficiente como para que la corte entendiera que quedaba privado de invocar las cláusulas del contrato que le beneficiaban.

De los hechos probados en el caso ante nos no puede decirse que tuvo efecto un cumplimiento sustancial. Con respecto a la quinta maleta—nunca encontrada—no hubo cumplimiento alguno del contrato. Desde el comienzo mismo de su ejecución tuvo lugar la desviación con una sustancial pérdida patrimonial para sus dueños. En nada se altera lo que se ha dicho por razón de haberse observado el contrato con respecto al recurrido y a su restante equipaje. La obligación que provee la transportación directa se imponía respecto a *todo* el equipaje. En *Lichten,* antes de ocurrir la desviación *todo* el equipaje había llegado a su destino.

En los términos que siguen se expresó el tribunal en *McKahan* v. *American Express Co.,* supra, 1051, 1052, 1053:

"Es materia de autoridad establecida que la desviación por el porteador de la ruta especificada en el contrato de transporte lo hace responsable como un asegurador de los bienes transportados, aunque el contrato de transporte lo exima de responsabilidad bajo las circunstancias (aparte de la desviación) por las que los bienes sufrieron el daño o se perdieron. . . . lo mismo sucede cuando ha ocurrido una desviación del método (incluyendo el modo y la manera) de la transportación acordada.

"En el caso presente el acuerdo del remitente al valorar los caballos en \$75 cada uno estaba obviamente basado *en los riesgos incidentales de la transportación acordada. . . .*" (Énfasis suplido.)

En *Oliver Straw Goods Corp.* v. *Osaka Shosen Kaisha,* 47 F.2d 878, 880, se dijo:

"En otras palabras las cláusulas limitativas aplican únicamente cuando el daño fue debido a las pérdidas surgidas *durante la ejecución del contrato.* . . ." (Énfasis suplido.)

El tribunal de instancia, al sostener que la desviación de los términos esenciales del contrato por el porteador le privaba del beneficio de las cláusulas que en su favor se estipularon, cita en apoyo una serie de casos entre los que se encuentra *McKahan* v. *American Express Co.,* al que ya nos hemos referido. Argumenta la recurrente que en ninguno de los casos citados por el tribunal sentenciador está envuelta la transportación aérea y sí el transporte marítimo y terrestre. No se nos invoca razón persuasiva que impida que el principio sentado en esos casos no sea analógicamente aplicable a casos de transportación aérea. La transportación marítima y terrestre, no puede negarse, reúne características y condiciones que son comunes a la transportación aérea. Todas tienen una finalidad en común cual es la transportación entre distintos puntos de personas y propiedades. No podría afirmarse con exactitud que los riesgos en un caso sean inherentemente mayores que en el otro. Tampoco podríamos ignorar el rápido y tremendo desarrollo de la transportación aérea en los últimos años, que la coloca, frente a las otras dos, en una posición de competencia muy por encima a la existente algunos años atrás.

En *Curtiss-Wright Flying Service* v. *Glose,* 66 F.2d 710, 712, aunque envolvía la transportación aérea interestatal se presenta una situación muy parecida a la que consideramos: la alegada negligencia en la operación del avión en cuestión causó la muerte al esposo de la demandante. Existía una cláusula en la que se limitaba la responsabilidad de la compañía aérea hasta el máximo de $10,000, aun en el caso de negligencia de la propia compañía. La corte, al permitir una

compensación en exceso a la cantidad mencionada, se expresó de la siguiente manera:

"La política establecida hoy día en la ley es que un porteador público al contratar con pasajeros no puede obligarles a relevarlos de la responsabilidad legal que tienen en caso de su propia negligencia. . . . Siendo ésa la ley, ¿por qué no debe ser aplicada al servicio aéreo de pasajeros? ¿Qué razón existe para que los mismos principios aplicables al transporte marítimo y terrestre no deban ser igualmente aplicables a la transportación por aire? Todos conducen un mismo servicio, esto es, la transportación. Son competidores para la misma clase de negocio. Cada pasajero que se transporta por aire significa un pasajero menos que se transportará por tren o por barco. Transportación, como denota su derivación, es llevar a través, y ya sea el transporte por tren, por agua o por aire, el propósito en mente y lo que se realiza tienen idéntico resultado."

En McNair, *The Law of the Air*, 2d ed. por Kerr y Mac-Crindle, se nos dice, al tratar sobre este punto:

"Queda por considerar si la analogía de la transportación por tierra y agua puede ser aplicada al examinar el efecto de la desviación. . . . No parece haber razón alguna para que aquellos mismos principios deban aplicar a un contrato de transporte aéreo. . . ."

Con respecto al caso de *Lichten* se expresa del siguiente modo:

"Su decisión difícilmente puede ser invocada en contra de la contención de que el concepto de desviación aplica a transportación por aire."

Demostrando el alcance del concepto "desviación", la corte, en *The Sarnia*, supra, se refiere a lo dicho en *The Indrapura*, 171 Fed. 929, 931 (pág. 463):

" . . . parece ahora comprender en general toda conducta de un barco *u otro vehículo usado en el comercio* tendiente a variar o aumentar los riesgos del transporte." (Énfasis suplido.)

Por lo expuesto, a juicio nuestro, no se incurrió en los errores cuarto y quinto.

■ Aunque creemos que se incidió en el primer error, ello no debe producir un cambio en la sentencia dictada. Cuando la demandada encontró la maleta en Baltimore y la puso en camino de Nueva York no podía conocer el contenido de ésta, toda vez que fue a las 9:00 p.m. que por primera vez el señor Firpi informó en Nueva York acerca de su contenido. Ese hecho, sin embargo, hubiese tenida alguna importancia tal vez en caso de haber actuado la recurrente de acuerdo con los términos del contrato.

El segundo error señalado, aceptando que fue cometido, no produciría la revocación de la sentencia. El telegrama a que se refiere el tribunal inferior está fechado el 17 de setiembre pero, como dice la recurrente, "en ley carece de efecto alguno el que un empleado de Pan American en Filadelfia u otro empleado en Baltimore o cualquier otro en cualquiera otra de las ciudades terminales tuviera o no *él personalmente* conocimiento de lo valioso de la maleta." La Pan American, como empresa, tuvo ese conocimiento desde el día mismo en que llegó el señor Firpi a Nueva York y en nada puede ayudarle el haber retardado el mensaje hasta el 17 de setiembre.

■ El tercer error señalado es que la sala sentenciadora erró al no formular una conclusión en el sentido de que el 13 de setiembre de 1958, fecha en que viajaron los esposos Firpi a Nueva York, se encontraba vigente y radicada en la Comisión de Aeronáutica Civil la tarifa de Pan American World Airways, Inc. "Passenger Tariff No. R.R. 3." No se incurrió en el citado error. La Regla 43.1 de Procedimiento Civil de 1958 requiere que el tribunal especifique los hechos probados y separadamente consigne sus conclusiones de derecho. Se ha dicho que la regla "tiene por miras, entre otros fines, ayudar a las cortes de apelación proporcionándoles una clara comprensión de la base en que descansa la decisión apelada." *Meléndez* v. *Metro Taxicabs*, 68 D.P.R. 766, 769 (1948). Su fin primordial es "poner a esta corte en condiciones de poder determinar si las conclusiones de hechos y

de derecho a que llegó el tribunal sentenciador estuvieron justificadas o no." *Santana* v. *García*, 71 D.P.R. 142 (1950), *Varela* v. *Fuentes*, 70 D.P.R. 879 (1950) ; *Santiago* v. *Martínez*, 72 D.P.R. 934, 936 (1951).

El tribunal cuya decisión ahora revisamos, no obstante no haber consignado separadamente la conclusión aludida, realizó una extensa discusión alrededor del efecto de dicha tarifa en relación con los hechos particulares ante él. Entre otras cosas, dijo que "si la maleta se hubiese perdido en el trayecto desde San Juan a Nueva York, que fue la ruta acordada entre las partes, la demandada hubiese respondido limitadamente de acuerdo con el caso de McKahan." Inclusive asume la validez de las cláusulas que limitan la responsabilidad en caso de pérdida de equipaje. En su final determinación la descarta por no considerarla aplicable al caso. De toda la discusión ofrecida por el tribunal, hemos tenido una clara comprensión de la base en que descansó su decisión. Como muy acertadamente se expresa en *Meléndez* v. *Metro Taxicabs*, supra: "Cuando se obtiene esta clara comprensión, la sentencia puede subsistir aun cuando se haya infringido la regla." Así, teniendo en cuenta las circunstancias particulares del presente recurso, decidimos que el cumplimiento sustancial de la Regla 43.1 cumple con las exigencias de ley. Es indispensable, sin embargo, que advirtamos que de ordinario un cumplimiento sustancial de la Regla 43.1 no constituye el cumplimiento que la misma ordena. Ella requiere una observancia cabal y completa. Ya esa precaución la hemos apuntado anteriormente. Véanse a este respecto los casos ya citados y otros que en los mismos se mencionan. Sólo en casos excepcionales debe sostenerse el cumplimiento de modo sustancial.

Nada encontramos en los autos que nos obligue a intervenir con la fijación de los honorarios de abogados.

Para finalizar pasemos someramente a tratar el punto relativo a la "jurisdicción primaria" levantado por

la recurrente. Sostiene ésta que permitir que prevalezca la determinación del tribunal inferior equivale a decidir que la Regla 9(b) de la tarifa que autoriza enviar el equipaje en un vuelo subsiguiente es irrazonable, y siendo así recaía en la Junta una determinación a tal efecto. No tiene razón. Convenimos con la recurrente en que bajo la doctrina de "jurisdicción primaria" un ataque contra la razonabilidad de la tarifa radicada en la Junta de Aeronáutica Civil debe hacerse primeramente ante esa agencia administrativa. *Furrow & Co.* v. *American Airlines*, 102 F.Supp. 808, 809 (1952); *Lichten* v. *Eastern Airlines*, supra. Ese principio responde claramente a otro que exige que cuando la materia en cuestión demanda el ejercicio de discreción administrativa que requiere el conocimiento especializado y experto, es a la agencia administrativa, poseedora de ese conocimiento y esa experiencia, a quien corresponde ese ejercicio. *CAB* v. *Modern Air Transport*, 179 F.2d 622, 624 (1950). Sin embargo, no es un problema de razonabilidad el que se presenta, como pretende la recurrente, sino que más bien fue un problema de determinar el ámbito de aplicación de la Regla 9(b) de la tarifa, que tuvo ante sí el tribunal inferior. Al enviar el equipaje en ruta distinta a la acordada actuó la recurrente en forma no autorizada por la citada regla. En *Jones* v. *Northwest Airlines*, 157 P.2d 728, 729 (1945), el tribunal convino con *Adler* v. *Chicago & Southern Airlines*, 41 F.Supp. 366, 367, en que cuando se ataca la razonabilidad o validez de una práctica regulada por la Ley de Aeronáutica Civil, tal determinación compete únicamente a la Junta de Aeronáutica Civil y, en ausencia de esa determinación, no puede la corte adquirir jurisdicción en el asunto. Sin embargo, añade más adelante:

"Donde, sin embargo, el porteador ha incumplido su contrato de transporte mediante la violación de sus propias tarifas, reglas, reglamentos o procedimientos, o aquellos de la comisión de comercio interestatal, no es necesario referir la materia a la comisión de comercio interestatal ya que *no existe hecho técnico alguno a ser determinado.*" (Énfasis suplido.)

Ver, además, *The Journal of Air Law and Commerce*, supra, págs. 23–25.

 En el caso que estamos considerando tampoco se ha tratado de impugnar la razonabilidad o validez de las tarifas que la Pan American radicó en la Junta de Aeronáutica Civil. Al igual que lo sucedido en la corte inferior en *Jones* v. *Northwest Airlines*, supra, se trata de una violación del contrato celebrado. Esa es una determinación puramente de ley que no requiere la asistencia de un grupo de personas con conocimiento especializado y de experiencia necesaria para bregar con cuestiones de hechos técnicos. Y no pudiendo la recurrente ampararse en el contrato de transporte celebrado de conformidad con las tarifas radicadas, somos de opinión que no era necesario una determinación previa de la Junta para conceder el remedio solicitado.

*La sentencia recurrida deberá confirmarse.*

—O—

### EN MOCIÓN DE RECONSIDERACIÓN

Sala integrada por el Juez Asociado Señor Belaval como Presidente de Sala y los Jueces Asociados Señores Hernández Matos y Santana Becerra.

EL JUEZ ASOCIADO SEÑOR HERNÁNDEZ MATOS emitió la opinión del Tribunal, en reconsideración.

San Juan, Puerto Rico, a 8 de marzo de 1967

El día 9 de octubre de 1963 confirmamos la sentencia del Tribunal Superior de Puerto Rico, Sala de San Juan, de fecha 16 de junio de 1960 concediendo $9,625.00 por la pérdida de determinadas joyas que contenía una maleta extraviada y $1,000.00 por honorarios de abogado.

El hecho destacado en la opinión anterior, fue el siguiente: La Pan American se obligó a transportar directamente de San Juan a Nueva York al señor Firpi y su señora esposa, conjuntamente con el equipaje de ambos. No se hizo declaración de valor especial para ninguna pieza del equipaje; pero,

la maleta cuya pérdida originó este litigio, fue colocada y enviada en un avión distinto a aquel en que viajaban los esposos Firpi y por una distinta ruta. No se ofreció prueba de clase alguna que justificara tal actuación de la Pan American. Esta manera de proceder representa una alteración o *desviación* sustancial de lo acordado en el contrato de transporte.

Como bien se explica en la anterior opinión todo contrato de transporte está sometido a la Regla 18 de la Tarifa RR-3 radicada por la porteadora y aprobada por la Junta de Aeronáutica Civil, que dispone:

"Regla 18—Límite de Responsabilidad:

Excepto lo que la Junta u otra ley aplicable disponga de una manera distinta, A—La porteadora no es responsable de reclamación alguna por daños de cualquier naturaleza surgidos de o relacionados con la transportación u otros servicios incidentales a tal transportación llevados a cabo por la porteadora a menos que se pruebe que tales daños fueron causados por la negligencia o culpa intencional de la porteadora y que no ha habido negligencia contributoria de parte del pasajero."

"E—(1) Cualquier responsabilidad de la porteadora está limitada a $16.50 (250 francos de oro franceses) o su equivalente por kilogramo en el caso de equipaje registrado u otra propiedad, a menos que con anticipación un valor más alto sea declarado y se paguen cargos adicionales de acuerdo a la tarifa de la porteadora. En tal caso la responsabilidad de la porteadora estará limitada al valor más alto declarado. En ningún caso la responsabilidad de la porteadora excederá a la pérdida real sufrida por el pasajero. Toda reclamación estará sujeta a la prueba de la cuantía de la pérdida."

"Regla 18(H) La porteadora no es responsable por pérdida, daño o demora en la entrega de artículos frágiles o perecederos, dinero, joyas, objetos de plata, documentos negociables, valores, documentos comerciales y muestras incluidos en el equipaje registrado del pasajero, con o sin el conocimiento de la porteadora."

La regla de derecho destacada en la opinión anterior, objeto de esta reconsideración, fue la siguiente: "La validez de disposiciones tarifarias limitativas de responsabilidad como la anterior ha sido consistentemente declarada por la juris-

prudencia americana al decidir casos que tratan de transportación interestatal. . . . Empero para que pueda el porteador invocar el amparo de esas disposiciones por razón del contrato de transporte celebrado, es necesario y fundamental que haya observado en su cumplimiento aquellos términos y condiciones que afectan directamente la esencia de la transacción llevada a cabo. . . . Un porteador público que sin justificación se desvía de la ruta de transporte pactada claramente contraviene las obligaciones del contrato. Al así actuar queda privado de invocar aquellas partes del contrato que en su favor han sido establecidas. . . . Por consiguiente, estará impedido, bajo esas circunstancias, de invocar el beneficio de una estipulación eximente de responsabilidad. . . ."

El derecho de la porteadora a desviar parte del equipaje o la totalidad del mismo está reconocido por la Regla 9 (b) de la misma tarifa que dispone: "El equipaje registrado será llevado en el mismo avión del pasajero a menos que de acuerdo con el porteador se considere impracticable, en cuyo caso, el porteador moverá el equipaje al vuelo próximo precedente o subsiguiente en que haya espacio disponible." Se puede tomar conocimiento judicial de la necesidad de ajustar el peso en la transportación aérea de acuerdo con la mayor seguridad para los pasajeros, la tripulación, el equipaje y la carga. Es natural que la determinación del peso más aconsejable, de acuerdo con la practicabilidad de los aeropuertos, las condiciones atmosféricas, etc., se deje al criterio experimentado o al conocimiento técnico del porteador. Como en los cuerpos humanos no hay tonelaje fijo y el tamaño y peso de la maleta está más regido por la vanidad que por la utilidad, la carga aérea está siempre sujeta a estos ajustes de reducción.

Ahora bien, un estudio más extenso del contrato de transporte aéreo en su totalidad, de acuerdo con los nuevos argumentos presentados, nos ha convencido, que en la opinión anterior le dimos demasiada importancia a la cuestión secundaria de la "desviación" de ruta y no consideramos las obli-

gaciones recíprocas de ambas partes en dicho contrato. Puede ser que el énfasis en la "desviación" de la ruta fuera el resultado de aplicar la jurisprudencia de otra clase de transportación en el cual el riesgo del deterioro por cambio de sitio— cubierta del barco por bodega, en el caso de la transportación marítima o aumento de fungibilidad por mayor duración de la transportación terrestre—creara una serie de problemas que no son típicos de la transportación aérea.

La Regla 9(A)(2) de la misma tarifa, relacionada con la declaración del equipaje aéreo, dispone: "Al ser entregado a la porteadora el equipaje que va a ser declarado, la porteadora insertará en el boleto el número de piezas y el peso del equipajo declarado (tal acción constituirá la expedición del registro del equipaje); la porteadora expedirá además a los fines de identificación solamente, un talón de reclamo de equipaje por cada pieza de equipaje así entregado. Todo equipaje en esta forma declarado estará debidamente empacado en maletas o envases similares de tal manera que asegure su transporte sin peligro mediante un manejo de cuidado ordinario. Artículos frágiles o perecederos, dinero, joyas, artículos de plata, instrumentos negociables, valores, documentos comerciales o muestras no serán aceptados como equipaje registrado."

■ De acuerdo con la tarifa de la porteadora sólo hay dos casos de transportación aérea de equipaje: (1) equipaje ordinario declarado por el número de bultos y el peso de cada uno y (2) equipaje especial declarado por el valor del bulto. En el primer caso, la responsabilidad por la pérdida del bulto ordinario la determina la primera declaración del apartado 18-E(1), en el sentido, que por equipaje ordinario declarado por el número de bultos y el peso de cada uno sólo se pagará $16.50 por kilogramo; en el segundo caso la responsabilidad por la pérdida de la valija especial la determina la segunda declaración del apartado 18-E(1) en el sentido, que por el equipaje declarado de acuerdo con su valor, se pagará el

valor más alto declarado, quedando entendido que en ninguno de los casos, excederá de la pérdida real, estando toda reclamación del pasajero contra la porteadora sujeta a la prueba de la cuantía de la pérdida.

Claro resulta que cuando no se declara ningún valor especial de determinada valija, y no se le da a la porteadora una oportunidad de examinar el contenido de la valija y mediante el aumento en el precio de transporte, tomar aquellas medidas de custodia especial, seguro adicional y entrega directa en el aeropuerto, que requiera el valor especial de la carga, la responsabilidad por la pérdida de la valija de valor especial será la misma que la del bulto ordinario, a razón de $16.50 por kilogramo. Tanto la Regla 18(H) como la Regla 9(A)(2) de la tarifa establecen claramente que las joyas no se aceptarán como equipaje ordinario (registrado).

*Por las razones expuestas, se revocará nuestra sentencia de 9 de octubre de 1963 y se dejará sin efecto la sentencia recurrida, dictada el 16 de junio de 1960 por la Sala de San Juan del Tribunal Superior de Puerto Rico, en el caso civil Núm. 58-6417 seguido por Miguel Firpi v. Pan American World Airways, Inc., ordenándose la devolución del caso al Tribunal de instancia para que dicte una nueva sentencia otorgando al recurrido compensación a base de la Regla 18-E(1) de la tarifa a que se refiere la anterior y última opinión nuestra de esta fecha, con costas pero sin imposición de honorarios de abogado.*